[No. 56597–0. En Banc. December 13, 1990.]

THE STATE OF WASHINGTON, *Petitioner*, v. LESLEY WAYNE SMITH, *Respondent*.

*Norm Maleng, Prosecuting Attorney, Cynthia S.C. Gannett, Senior Appellate Attorney,* and *Barbara B. Linde* and *Theresa L. Fricke, Senior Deputies,* for petitioner.

*Julie A. Kesler* of *Washington Appellate Defender Association,* for respondent.

CALLOW, C.J.—The State appeals the decision in *State v. Smith,* 54 Wn. App. 467, 774 P.2d 519 (1989) which overturned Smith's conviction of attempted first degree murder. The State contends that it produced sufficient evidence at trial to support a prima facie showing of the corpus delicti. We agree with the State and reverse the Court of Appeals. Hence, we reach the following issues which were raised by Smith, but not decided by the Court of Appeals: (1) whether the prearrest search of the vehicle's passenger compartment was unreasonable; (2) whether Smith was illegally arrested pursuant to an unconstitutional ordinance; and (3) whether items found in the vehicle's trunk should have been suppressed. We affirm the trial court's finding that Smith was guilty of attempted first degree murder.

# I

## FACTS

On December 6, 1986, shortly after 1 a.m., an officer of the Bellevue Police Department heard a report of a stolen taxi. The stolen taxi's last known location was near the site where the officer was patrolling. Shortly after hearing the stolen vehicle report, the officer observed headlights in Robinswood Park. Because the park was closed, the officer suspected that this vehicle was the stolen taxi and that it had been abandoned in the park.

The officer approached the vehicle on foot. After recognizing that the vehicle was not the stolen taxi, he decided to contact the vehicle's occupants because their presence in the park violated park rules. The officer saw three men in the car. Lesley Wayne Smith was in the front passenger seat and Steven Brown and Ural Daniels were in the backseat. No one was in the driver's seat. The officer saw Smith attempt to hide a beer bottle under his coat (alcoholic beverages are not allowed in the park). He twice asked Daniels to roll down his window and Daniels refused each time. Brown, however, got out of the vehicle.

The officer asked Brown for identification and asked why they were in the park. Brown explained that Daniels had to use a restroom. While Brown was searching for his identification, the officer noticed that Brown had a concealed weapons permit. Upon questioning, Brown answered that he had a weapon under the front seat of the car. Concerned for his safety, the officer called for a backup unit.

In a few minutes, a second officer responded to the request for assistance. Brown, Daniels, and Smith were each removed from the car and searched for weapons. A knife was found strapped to Smith's leg. No weapons were initially found on Brown or Daniels. Later, it was determined that Brown was carrying a pair of handcuffs.

The second officer then entered the vehicle's passenger compartment to search for Brown's weapon. He found a loaded .41 magnum revolver between the right front seat and the console. He also found two knives, a box of .41

magnum ammunition, and a loaded magazine for a 9 mm. weapon. The first officer initially believed that the 9 mm. magazine was for an illegal automatic weapon and called for additional units. At this point, Smith, Brown, and Daniels were advised of their *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

Additional backup units were requested, including a K–9 unit to find a possible fourth person. The second officer asked Brown where the weapon that belonged with the 9 mm. magazine clip was located. Brown stated that the weapon was in his backpack in the backseat. Indeed, in the backpack was a 9 mm. semiautomatic pistol.

Brown, Daniels, and Smith were each placed in a different police vehicle. Daniels, appearing nervous and agitated, was the only one who resisted and had to be subdued. At this time, all three men were arrested for violating park rules.

The second officer asked Smith who had rented the vehicle and for permission to search the vehicle. Smith queried what would happen if he denied the search and the officer replied that the vehicle would be impounded and a search warrant sought. Smith consented to the search, signing a written consent form.

A search of the car's trunk revealed the following items: clothes, a new shovel, a pick, a compound bow and arrows, rope, tarps, rain gear, a 100–pound bag of lime (the officers thought it was cement), and a large ammunition box. The ammunition box contained several survival knives, a disassembled shotgun, a $CO_2$ pellet pistol, a wooden stick with a spiked ball at the end of a chain, and several sexually explicit magazines.

Following the search of the trunk, a third officer went to Smith and asked him if he had been read his rights. Smith stated that he had and that he understood those rights. This officer stated that the items found in the vehicle did not appear to conform to Smith's prior statement of what the three men were doing. He also stated that it appeared

that they were intending to commit a murder and that the shovel and "concrete" were to bury the body. Smith responded that the officer was close. Smith said that he had an item in his pocket that would explain what was happening. In Smith's pocket were 15 $100 bills. Smith explained that Brown had paid him to kill Daniels.

In a taped statement, Smith detailed the murder plot. On the previous Wednesday, Brown had asked Smith if he wanted some quick cash for "knocking off" and "burying" a guy. On Thursday, Smith selected a site on Snoqualmie Pass where he planned to lie in wait, and then, when Brown brought Daniels to the spot, Smith would kill Daniels, dig a grave, and bury him. On Friday, Brown and Smith went back to the location where Brown was going to leave Smith. However, campers were at the predetermined area so Smith and Brown drove back to Seattle and picked up Daniels. In Bellevue, Daniels "freaked out" and said he had to go to the bathroom, so they pulled into the park. Smith confessed that he and Daniels had a fight at the park. Smith pulled out a knife and "was going to stick him" when Smith looked over his shoulder and noticed a police officer coming up from behind.

Smith was charged with and convicted of attempted first degree murder. Neither Brown nor Daniels testified during Smith's trial.

## II
### Issues

A. *Whether the Court of Appeals erred in finding the circumstantial evidence of corpus delicti insufficient to admit Smith's confession?*

The State contends that the circumstantial proof of the corpus delicti of attempted first degree murder was sufficient to admit Smith's confession. We agree.

In Washington, a confession, standing alone, is insufficient to establish the corpus delicti of a crime. The "corpus delicti rule" is described as follows:

The confession of a person charged with the commission of a crime is not sufficient to establish the *corpus delicti,* but if there is *independent proof* thereof, such confession may then be considered in connection therewith and the *corpus delicti* established by a combination of the independent proof and the confession.

The independent evidence need not be of such a character as would establish the *corpus delicti* beyond a reasonable doubt, or even by a preponderance of the proof. *It is sufficient if it prima facie establishes the corpus delicti.*

(Some italics ours.) *Bremerton v. Corbett,* 106 Wn.2d 569, 574–75, 723 P.2d 1135 (1986) (quoting *State v. Meyer,* 37 Wn.2d 759, 763–64, 226 P.2d 204 (1951)). In this context, "prima facie" means that there is "evidence of sufficient circumstances which would support a logical and reasonable inference" of the facts sought to be proved. *Corbett,* at 578–79. The State was required to produce evidence that supported a logical and reasonable deduction of the elements of the corpus delicti of attempted first degree murder. "The independent evidence need not [have been] sufficient to support a conviction or even to send the case to the jury." *Corbett,* at 578.

Corpus delicti is usually proved by the following two elements: "(1) an injury or loss (*e.g.,* death or missing property) and (2) someone's criminal act as the cause thereof." *Corbett,* at 573–74. However, crimes such as attempt, conspiracy, perjury, and reckless or drunken driving do not require the first corpus delicti element, injury or loss. *See* 2 W. LaFave & A. Scott, *Criminal Law* 18 (2d ed. 1986). In these cases, many courts and commentators have found that the more appropriate application of corpus delicti is to prove that the crime charged has been committed by a particular person. *See Corbett,* at 578 (the corpus delicti of driving or being in control of an automobile while intoxicated was "met by proof that [a person was] driving or in actual physical control of a vehicle while intoxicated"); LaFave, at 18 (noting that "[p]erhaps . . . it is more accurate to say that the *corpus delicti* embraces the fact that a crime has been committed by someone").

▇ The crime in this case was attempted first degree murder. To convict Smith of attempted murder, the State was required to prove that Smith: "(1) actually intended to take a life; and (2) took a substantial step toward the commission of the act. RCW 9A.28.020(1); RCW 9A.32-.030(1)(a)." *State v. Smith,* 54 Wn. App. 467, 472, 774 P.2d 519 (1989). The Court of Appeals further stated that the proof of corpus delicti of attempted first degree murder was that a *substantial step* was taken to criminally end someone's life. *Smith,* at 472. Neither the State nor Smith challenges this definition of corpus delicti. Unlike the Court of Appeals, however, we find that the State presented sufficient evidence.[1]

▇ The Model Penal Code offers guidance in determining whether there was sufficient evidence to support a logical and reasonable deduction that a substantial step to criminally end someone's life had been taken. In *State v. Workman,* 90 Wn.2d 443, 452, 584 P.2d 382 (1978), we adopted the Model Penal Code's definition of a "substantial step." As noted in that opinion, "conduct is not a substantial step 'unless it is strongly corroborative of the actor's criminal purpose.'" *Workman,* at 451 (quoting Model Penal Code § 5.01(1)(c) (Proposed Official Draft, 1962)). The court in *Workman* also cited the Model Penal Code's list of several types of conduct which, "if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law". *Workman,* at 451 n.2 (quoting Model Penal Code § 5.01(2)). One of these is the "possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under

---

[1]"In assessing the sufficiency of the proof of the corpus delicti . . ., [the reviewing court must] assume the truth of the State's evidence and all reasonable inferences therefrom in a light most favorable to the State." *State v. Smith,* 54 Wn. App. at 473 (citing *Corbett,* at 571; *State v. Neslund,* 50 Wn. App. 531, 544, 749 P.2d 725, *review denied,* 110 Wn.2d 1025 (1988)). Corpus delicti "can be established by either direct or circumstantial evidence." *State v. Lung,* 70 Wn.2d 365, 371, 423 P.2d 72 (1967).

the circumstances". *Workman*, at 452 n.2 (quoting Model Penal Code § 5.01(2)).

Here, the State's evidence consisted of physical evidence and police observations. The physical evidence found on the suspects and in the car's passenger compartment included: 15 $100 bills in Smith's pocket, a concealed survival type knife strapped to Smith's leg, a pair of handcuffs on Brown's person, a loaded handgun, a knife, a folding knife, ammunition for another weapon, and a semiautomatic pistol. The items found in the car's trunk included: survival knives, a compound bow with arrows, a shotgun, a pellet gun and ammunition along with a shovel, a pickax and a bag of lime. Additionally, the police officers' observations included: a vehicle illegally parked at 1 a.m., the absence of an apparent driver, and the nervous agitation and lack of cooperation of Daniels.

In reviewing this evidence, the Court of Appeals found that nothing in the record suggested that the money was intended as compensation for an illegal act, apart from Smith's confession. Furthermore, that court reasoned, the presence of all the weapons raised a reasonable concern, but apart from the confession there was no evidence that murder had been attempted. *Smith*, at 473.

The corpus delicti rule *does not require* that the State prove, absent Smith's confession, that murder had been attempted. As outlined in *Corbett*, the State must produce evidence of sufficient circumstances which would support a *logical and reasonable deduction* that a substantial step (strongly corroborative of criminal purpose) had been taken to criminally end someone's life.

We find that the State's evidence supports a prima facie showing of the corpus delicti of attempted first degree murder. Even without Smith's confession, the State's evidence—Smith's 15 $100 bills, the arsenal of weapons, the ammunition, a digging implement, as well as the police observations—supports a logical and reasonable deduction that a substantial step had been taken to kill someone. This logical and reasonable deduction was all that the State

was required to prove in order to allow Smith's confession to be considered.

Federal courts and a minority of state courts have abandoned the corpus delicti rule in favor of the federal "corroboration" rule.[2] *Smith,* at 472. In the State's petition for review, the State now requests that we adopt the federal corroboration rule. Because of our disposition of this case and application of the corpus delicti rule to these specific facts, we are not compelled to adopt the federal corroboration rule at this time.

B. *Whether the prearrest search of the passenger compartment of the vehicle was unlawful?*

Smith concedes that the police officer's initial detention of the vehicle was justified to investigate a violation of park rules. Smith also concedes that the officers had sufficient reasons to remove the three passengers from the vehicle and frisk them. Smith argues, however, that after the police ascertained that Brown, Daniels, and Smith were no longer armed, the officers should not have proceeded to search the passenger compartment of the vehicle.

As Smith argues, "the mere lawfulness of a detention does not automatically render a subsequent search reasonable under article 1, section 7 [of the Washington Constitution] and the Fourth Amendment." *State v. Kennedy,* 107 Wn.2d 1, 9, 726 P.2d 445 (1986). Although Smith concedes that the initial stop and frisk were proper, the question remains whether the officers' subsequent detention of and intrusion into the vehicle were unlawful.

In *State v. Williams,* 102 Wn.2d 733, 738, 689 P.2d 1065 (1984) (discussing *Florida v. Royer,* 460 U.S. 491,

---

[2]The federal corroboration rule requires the government to "introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. . . . It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Opper v. United States,* 348 U.S. 84, 93, 99 L. Ed. 101, 75 S. Ct. 158, 45 A.L.R.2d 1308 (1954).

500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983)), we noted the federal rule that

an investigative detention must be temporary, lasting no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed must be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

However, "[t]he scope of an investigatory stop . . . may be enlarged or prolonged . . . if the stop confirms or arouses further suspicions." *State v. Guzman–Cuellar*, 47 Wn. App. 326, 332, 734 P.2d 966, *review denied*, 108 Wn.2d 1027 (1987). A police officer may extend his "frisk" for weapons into the passenger compartment of the vehicle if he has a "reasonable suspicion that the suspect is dangerous and may gain access to a weapon in the vehicle." *State v. Williams*, 102 Wn.2d at 738–39 (discussing *Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983)).

Smith argues that no suspicious circumstances existed to justify broadening the scope of the officers' inquiry or prolonging the stop beyond the extent necessary to cite the offenders for violating the park rules. However, the record reflects numerous suspicious circumstances that support the officers' search of the passenger compartment of the vehicle. When the officer first approached the vehicle, no one occupied the driver's seat. Potentially, a fourth person was in the vicinity. One passenger, Daniels, appeared agitated and was uncooperative with the police. Moreover, several lethal weapons were discovered: (1) when Brown searched for identification, the police officer noted a concealed weapons permit and Brown admitted that a weapon was in the car; and (2) a search of Smith revealed a knife strapped to his leg.

Because of the time of night, the possibility of a fourth person in the vicinity, Daniels' uncooperative behavior, and the numerous weapons, the officers were reasonably suspicious that the suspects were dangerous and might try to gain access to the weapon in the vehicle. The search of the passenger compartment was valid.

■ Moreover, contrary to Smith's assertion,[3] the officers' detention of Smith prior to his arrest was valid and did not exceed the proper scope of a *Terry* stop. *See Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In *State v. Williams, supra* at 740, we noted three factors which are relevant to whether the scope of an intrusion requires probable cause: "the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained." Here, as noted above, the officers properly enlarged the scope of the investigatory stop based on their suspicions that the occupants were dangerous and had access to numerous weapons. These suspicions were enhanced after the officers discovered a semiautomatic magazine clip. The amount of physical intrusion the officers exerted upon Smith's liberty was consonant with the officers' suspicions that the vehicle's occupants were armed and dangerous. Prior to his arrest, Smith was placed in a patrol car pending the investigation of the passenger compartment of the vehicle. Smith was not handcuffed until after his arrest. Under Washington case law, this physical intrusion was valid and within the proper scope of a *Terry* stop.

In *State v. Wheeler,* 108 Wn.2d 230, 737 P.2d 1005 (1987), at the time of the investigatory stop, the officers had been informed that a burglary was in progress and were given a description which matched the defendant. The officers asked no questions of the defendant except his name, told him he was being held in custody on suspicion of burglary, frisked him and found nothing, handcuffed him, placed him in a patrol car, and transported him to the scene of the crime. *Wheeler,* at 233. We found that although this physical intrusion was "significant", it "was

---

[3]Smith argues that the sole item found in the search of the passenger compartment which raised any question of illegality was the semiautomatic clip and semiautomatic gun. Smith contends that the officer should have determined if the gun was illegal or not; not handcuff the men and place them under arrest. Smith contends these actions constituted an illegal arrest.

not excessive and was permissible under a *Terry* stop."
*Wheeler*, at 235.

Here, Smith was frisked and a survival knife was found strapped to his leg. He was placed in a patrol car and was not handcuffed until after he was arrested. When compared to the detention upheld in *Wheeler,* Smith's detention was clearly valid because of the weapons found in the vehicle, the time of night, the agitation and uncooperative attitude of Daniels, and the possibility of a fourth person in the vicinity. The record is unclear as to exactly how long Smith was detained before he was arrested; however, there is no indication that the length of time was excessive, and Smith does not argue this point. The officers were justified in prolonging their investigatory stop and calling for additional backup units because of the increasingly suspicious circumstances. Smith's detention and the scope of intrusion were proper.

C. *Whether Smith was arrested under an unconstitutional ordinance?*

Smith claims that he was arrested under an unconstitutional ordinance. Smith contends that the ordinance failed to give notice of what constituted a crime and encouraged arbitrary and erratic stops and arrests.

Smith was arrested pursuant to former Bellevue City Code 3.44.010, which stated:

> The following rules shall apply and be in force in all public parks . . .
> A. No alcoholic beverages shall be allowed in those areas open to the general public at the time, except that this prohibition shall not apply to premises duly licensed by the State Liquor Control Board . . ..
> B. There shall be no loitering in or about the vicinity of bathhouses or restroom facilities.
> . . . .
> E. No firearms, airguns or weapons shall be displayed or used, except when displayed or used by duly authorized law enforcement officers . . ..
> . . . .
> J. Parks and school sites shall be closed between ten p.m. through seven a.m.
> (Prior code § 9.05.010.)

The Bellevue City Code appears to delineate clearly what behavior is prohibited in the park. While a penalty was not set out in the ordinance, Bellevue City Code 1.16.020 states:

> The violation of any ordinance is a misdemeanor unless specifically designated as a gross misdemeanor or traffic misdemeanor. Each violation may be prosecuted by the authorities of the city . . . or may be redressed by civil action at the option of the authorities . . ..

In arguing that the ordinance is unconstitutional, Smith relies upon *State v. Marchand,* 104 Wn.2d 434, 706 P.2d 225 (1985) and *State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982). These cases are, however, distinguishable from the present case. In *Marchand,* this court voided the statutes that allowed the State Patrol to do "spot checks" because the statutes did not impose constraints on the State Patrol's discretion in making such stops. In contrast, the Bellevue ordinance specifically delineates what conduct is prohibited in the parks; hence, constraints were imposed on the discretion of officers enforcing the Bellevue ordinance.

Similarly, in *White* this court invalidated a "stop–and–identify" statute because it "fail[ed] to give fair notice of what activities [were] required or forbidden and . . . encourage[d] arbitrary and erratic stops and arrests." *White,* at 99. Again, the Bellevue ordinance is distinguishable because it clearly delineates the forbidden behavior and, therefore, does not encourage arbitrary stops.

Smith also claims that the ordinance is unconstitutional because it does not contain guidelines as to when a police officer should consider a violation a criminal or a civil matter. Smith claims that if a statute prescribes two penalties for the same act, the rule of lenity requires that only the lesser penalty may be applied.

Smith relies on *State ex rel. McDonald v. Whatcom Cy. Dist. Court,* 92 Wn.2d 35, 37–38, 593 P.2d 546 (1979) and argues that any ambiguity in the statute must be resolved in his favor. However, Smith cites no authority for his proposition that the analysis in *McDonald* requires that

his offense must be treated as a civil matter instead of a criminal matter. Furthermore, this court has previously held that "it is constitutionally permissible to provide for civil or criminal penalties, or both, for the same act." *Yakima Cy. Clean Air Auth. v. Glascam Builders, Inc.*, 85 Wn.2d 255, 260, 534 P.2d 33 (1975). Smith has failed to meet his burden of proving that the ordinance at issue is unconstitutional.

D. *Whether Smith's consent to search the car trunk was involuntary?*

Smith implies that his consent to search the trunk of the car was involuntary; therefore, all items discovered under the consent to search should be suppressed. We disagree.

▮ The State has the burden of demonstrating that Smith's consent to the search was voluntarily given. *State v. Shoemaker*, 85 Wn.2d 207, 210, 533 P.2d 123 (1975); *State v. Nelson*, 47 Wn. App. 157, 163, 734 P.2d 516 (1987) (prosecution must show consent was voluntary "by clear and convincing evidence"). "[T]he voluntariness of a consent to search is a question of fact to be determined by considering the totality of circumstances surrounding the alleged consent." *Shoemaker*, at 211–12 (discussing *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)). Several factors that should be considered in making a determination of voluntariness are: "(1) whether *Miranda* warnings had been given prior to obtaining consent; (2) the degree of education and intelligence of the consenting person; and (3) whether the consenting person had been advised of his right not to consent." *Shoemaker*, at 212. The various relevant factors are weighed against one another and no one factor is determinative. *Shoemaker*, at 212; *Nelson*, at 163 ("Although knowledge of the right to refuse consent is relevant, it is not absolutely necessary. *Miranda* warnings are not a prerequisite to a voluntary consent. Merely because an individual is in . . . custody . . . does not mean that consent is coerced." (Citations omitted.)).

Here, Smith was read his *Miranda* rights prior to being arrested. After Smith was placed under arrest, the police officers asked for his consent to search the vehicle's trunk. When Smith asked what would happen if he refused to consent, the police officer replied that the vehicle would be impounded and a search warrant would be sought. By his questions, Smith appears to have adequately understood what he was doing. Moreover, Smith signed a written consent to the search which included specific language that documented his right to refuse consent. Clearly, Smith voluntarily acquiesced to having the vehicle searched.

Citing *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968), Smith also contends that mere acquiescence in the face of a show of police authority does not constitute a voluntary consent. *Bumper* is distinguishable, however, because when asking to search the house of the defendant's grandmother, the police officer in *Bumper* claimed he had a search warrant when in fact he did not. In the instant case, Smith was never told that the officers had a search warrant. Smith was told that the officers would *request* a search warrant if Smith did not consent to the search. Nothing in the record supports the allegations that Smith was coerced into consenting to the search.

III

CONCLUSION

The Court of Appeals is reversed. The trial court's finding that Smith was guilty of attempted first degree murder is reinstated.

DOLLIVER, ANDERSEN, DURHAM, and GUY, JJ., concur.
BRACHTENBACH, J., concurs in the result.

UTTER, J. (dissenting)—While I agree that the majority correctly states the corpus delicti rule, I cannot agree that the State provided sufficient evidence, independent of Smith's confession, to establish the corpus delicti of attempted murder.

Smith was charged with first degree attempted murder. In order to convict him of this crime, the State must prove that he (1) actually intended to take a life, and (2) took a substantial step toward the commission of the act. RCW 9A.28.020(1); RCW 9A.32.030(1)(a). The Court of Appeals correctly held that the corpus delicti of attempted murder is the substantial step taken to criminally end someone's life. *State v. Smith*, 54 Wn. App. 467, 472, 774 P.2d 519 (1989) (citing *Bremerton v. Corbett*, 106 Wn.2d 569, 723 P.2d 1135 (1986)). The question of what constitutes a substantial step depends on the facts of the case. Mere preparation alone is not sufficient. *State v. Workman*, 90 Wn.2d 443, 449–50, 584 P.2d 382 (1978). The evidence presented in this case is not sufficient to establish the corpus delicti of attempted murder.

The State must present sufficient evidence to support a logical and reasonable deduction that a substantial step had been taken to criminally end Daniels' life. *Corbett*, 106 Wn.2d at 578–79. The majority relies on *State v. Workman, supra,* in establishing possession of the weapons as sufficient evidence of Smith's having taken a substantial step. *Workman* is not on point for two reasons: the weapons were possessed illegally, and the illegal possession of weapons was an element of the crime charged. *Workman,* at 447–48. In the present case, the weapons were legally possessed, and the possession of a weapon is not a requisite element of the crime of attempted murder.

The facts in this case may create a suspicion that preparations were made in anticipation of criminal activity, but they do not indicate that a substantial step was taken. In *Corbett,* this court required proof of someone's criminal act as an element of corpus delicti.[4] There is no underlying criminal act in this case. The legal possession of weapons is not a criminal act and does not constitute the substantial step element of attempted murder.

---

[4]I agree with the majority that proof of injury or loss is not a required element of corpus delicti in crimes such as attempt.

The State's evidence of the substantial step element consisted of the following: $1,500 found in Smith's pocket; a hunting knife strapped to Smith's leg; a loaded handgun under the front seat; two knives and some ammunition in the passenger compartment; and miscellaneous weapons, ammunition, a shovel and some lime found in the trunk compartment. The State also offered the testimony of the police officers concerning their observations of the scene: a vehicle illegally parked at 1 a.m., the absence of an apparent driver, and the nervous agitation and lack of cooperation of Daniels.

Assuming the truth of the State's evidence and all reasonable inferences therefrom, *Corbett,* 106 Wn.2d at 571, this evidence, standing alone, does not reveal an underlying criminal act which would establish that a substantial step had been taken to criminally end Daniels' life. The Court of Appeals found that nothing in the record indicated that the $1,500 was intended to be compensation for an illegal act. *Smith,* at 473. Daniels, the supposed victim, was belligerent and agitated. This establishes nothing and is not necessarily the conduct one would expect from the intended victim of a murder attempt. All the weapons were possessed legally. *Smith,* at 469, 473. The State's evidence established only that three men were sitting in a car, in a park, late at night, and that at least one of the men was drinking beer. Only a violation of a local city ordinance is established. There is no identifiable underlying act found in the record which shows that Smith took a substantial step toward criminally ending Daniels' life. A logical and reasonable deduction that Smith attempted to murder Daniels cannot be reached based on the facts presented.

The majority states that it is not adopting the federal corroboration rule at this time. The rule requires "*strong* corroboration of *essential* facts and circumstances embraced in the defendant's confession." *State v. Parker,* 315 N.C. 222, 236, 337 S.E.2d 487 (1985). In finding that Smith's conduct—possession of $1,500 and of various weapons—is corroborative of his criminal purpose,

attempted murder, the majority is in fact relying on the rule in its analysis. The majority finds that the State's evidence corroborates Smith's confession. Such a finding is not sufficient under the corpus delicti rule. Corpus delicti requires independent, not corroborative, evidence. *Corbett,* 106 Wn.2d at 574.

In his confession, Smith stated that he, Brown and Daniels were standing outside the car, and that he was about to stab Daniels with a knife when he noticed a police officer approaching. This confession is contradicted by the testimony of that very police officer. The officer testified that the men were *inside* the car, and that it was a beer can, not a knife which Smith was attempting to conceal. Smith's confession was not confirmed by either Brown or Daniels. Nor can it be independently established by the evidence presented. The confession, standing alone, is not sufficient to convict Smith of the crime of attempted murder.

In *Freeman v. State,* 630 S.W.2d 868 (Tex. Ct. App. 1982), a case which involved similar issues, the Texas court addressed the question of the corpus delicti of attempted murder. The case involved a shooting. The independent evidence offered at trial included testimony by the police officers who observed the wounded victim and investigated the incident. The court held that the corpus delicti of attempted murder is the performance of an act with intent to cause the death of some person. *Freeman,* at 870. Unlike *Freeman,* there has been no shooting or stabbing, no injury, no substantial step taken toward attempted murder. The State has failed to show, by independent evidence, that Smith performed an act with intent to criminally end Daniels' life.

I would affirm the Court of Appeals based on the corpus delicti issue. I concur as to the remaining issues.

DORE and SMITH, JJ., concur with UTTER, J.