[No. 23783-1-II.    Division Two.    January 28, 2000.]

THE STATE OF WASHINGTON, *Appellant*, v. KELLY ANNE PINEDA, *Respondent*.

---

[20]*State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995).

*Russell D. Hauge, Prosecuting Attorney*, and *Randall Avery Sutton* and *Kevin M. Anderson, Deputies*, for appellant.

*Pattie Mhoon*, for respondent (appointed counsel for appeal).

MORGAN, J. — The trial court dismissed a second degree manslaughter charge because the State could not prove corpus delicti. We affirm.

In early 1998, Kelly and Salvador Pineda lived in Bremerton with their two-year-old son, Angelo. On February 22, 1998, they had a daughter, Amber. Thereafter, Kelly, Salvador, Angelo and Amber shared the same bed, a futon.

Salvador worked the 4 P.M. to midnight shift at a Seattle restaurant. Kelly generally waited up for him, "dressed

nice," according to his later testimony.[1] Once he was home, they would retire together.

On the morning of March 2, 1998, Kelly and Salvador took Amber to a doctor for a routine physical examination. The doctor thought that Amber was healthy and that Kelly and Amber were bonding well.

During the afternoon of March 2, Salvador left for work in normal fashion. He got home at approximately 2:40 A.M. on March 3.[2] After looking for something to eat in the kitchen, he went to the futon on which Kelly, Angelo and Amber appeared to be sleeping. Kelly was dressed, her hair was neatly arranged, and she was wearing makeup, earrings and a necklace. Amber looked pale, so he picked her up and found that she was "thoroughly flat, no breathing, no nothing."[3] He woke Kelly, told her "[s]omething is wrong here," and called 9-1-1.[4]

Paramedics took Amber to the hospital, where she was pronounced dead. Her body did not show any sign of foul play.

Kelly and Salvador reacted differently. Kelly did not manifest emotion, while Salvador wept openly.

On March 3, about 12 hours after Amber's death, Detectives Lopez and Cronk interviewed Kelly at the family home. She was calm, polite, and did not cry; at times, she even laughed or giggled. Detective Lopez thought that "[h]er demeanor was other than what I would call the demeanor for a mother who had just lost her child."[5]

On March 4, about 36 hours after Amber's death, the two detectives interviewed Kelly, by herself, at the police station. The interview lasted more than five hours. The detectives did not advise Kelly of her right to remain silent

---

[1]Report of Proceedings at 52.

[2]This was an hour or so later than usual, because the ferry system had cancelled the ferry on which he usually commuted.

[3]Report of Proceedings at 52.

[4]Report of Proceedings at 52-53.

[5]Report of Proceedings at 141.

or her right to obtain counsel, and Kelly did not seek to invoke those rights.

During the interview, Detective Lopez used, in his words, a "ruse" or "deceptional lie."[6] He later testified:

Q: [by defense counsel]: And you used a rouse [sic] in the case of Kelly Pineda on March 4th of 1998?

A: [by Lopez]: Yes, sir, I did.

Q: How many times did you lie to Kelly?

A: It was one time, but it entailed two different instances or information.

Q: Okay. And could you please detail that for me, please?

A: Sure . . . . I had recently done a death investigation involving a female by the name of Beth.[7] I told her that Beth had held her child . . . face down into . . . a changing table, and that the baby had suffocated, and but the mother had done that on accident, unintentionally.

Q: And what was the purpose of telling her about that?

. . . .

A: [S]ome of the information . . . gave me an indication that Kelly had done something to the child, to Amber, and I was trying to determine at that point if she would provide further information on what had happened, or if she would deny further information on what happened.

. . . .

Q: What was the other rouse [sic] that you used?

. . . .

A: I don't consider it two separate rouses [sic]. I consider it all in one, because it was all said in the same basic time frame, was that my own wife, when she was a teenager had done something similar to that . . . . [W]hat she had done

---

[6]Report of Proceedings at 179-80.

[7]It appears that Beth was a fictional person.

wasn't something she had meant to do. It was just basically an accident.[8]

During the interview, the detectives intentionally withheld some but not all of the information they had received from Dr. Emmanuel Lacsina, the forensic pathologist who autopsied Amber's body. As Detective Lopez later explained:

Q: And were there any other rouses [sic] that you recall using?

A: No, sir.

Q: How about when you told her about the possible causes of death for Amber, that you had received from Dr. Lacsina?

A: I don't consider that a rouse [sic]. Basically what that is, is I just left out some information that I had received.

Q: So leaving out information is not misleading?

A: Well, I suppose you could say I was misleading, but . . . the reason it was left out was because there was a possibility that Kelly had caused the death of her child, that giving her an out with saying one of the possibilities was SIDS, that she's going to jump onto that. She's not going to admit to what she did.

. . . .

Q: And you told Kelly that you had spoken to Dr. Lacsina?

A: Yes, sir, I did.

Q: And you told her that Dr. Lacsina had advised you that the possible causes of death were smothering or suffocation?

A: Yes, sir.

Q: And you intentionally left out the possibility of SIDS?

A: Yes, sir, I did.

Q: In point of fact, Dr. Lacsina told you that SIDS was a possible cause of death?

---

[8]Report of Proceedings at 180-82.

A: He said at that point, that there was similarities in all three of those kind of deaths.

Q: Dr. Lacsina advised you that his autopsy revealed that the child could have died from SIDS, suffocation, or smothering; isn't that true?

. . . .

A: [T]hat's basically what he was advising, yes.

Q: And he further advised you that the cause of death was unknown, didn't he?

A: At that point, yes.

Q: Until your investigation was concluded?

A: Yes, sir.

Q: And you asked him not to put a conclusion in his autopsy report until you had completed your investigation, did you not?

. . . .

A: [I]t's a common practice, that when we're doing an investigation in conjunction with the coroner's office . . . on a suspicious death, that the coroner will normally wait until an investigation process is completed so that he can review that along with his autopsy results, to come with the conclusion of a death. That's . . . the way that I understand that death investigations or possibly suspicious deaths are done.

Q: You told Kelly that there were indications of petechia[e] on Amber's eyelids; is that true?

A: Yes, I did.[9]

Q: And you told her that that indicated that her baby had died of either smothering or suffocation?

A: I said that was indications of that.

Q: How many times did Kelly tell you that she . . . didn't see how Amber could have been suffocated or smothered?

---

[9]As far as the record shows, Amber's eyelids did not display petechiae.

A:  I would have to look and count in the report.

. . . .

Q:  [I]t was several times, wasn't it, or many times?

A:  I think there was at least two, maybe there might have
    been a few more.[10]

The detective also asked Kelly to take a Computerized
Voice Stress Analyzer test. The record does not show the
nature of this test or whether it is scientifically reliable.
Kelly agreed to take the test, which lasted about an hour.
After completing the test, Kelly was told by Detective Lopez
that it "had come out deceptive."[11] She responded "that
she didn't see how that could happen, because she . . . was
being truthful."[12]

At various points in the interview, the detectives sug-
gested to Kelly that she might have unintentionally "rolled
on to . . . Amber, causing her to stop breathing,"[13] or that
she might have "unintentionally done something like place
a pillow or hand around Amber's nose because she was
upset at Amber for doing something . . . ."[14] Near the end
of the interview, Detective Lopez stated outright that he
thought Kelly "had killed the baby intentionally."[15] Accord-
ing to Detective Lopez, Kelly angrily responded

> that what had happened was accidental, and that she must
> have fallen asleep, because she could not remember anything
> past the point of what she had told us. What she had told us is
> what she had done, laying on the baby, holding her hand over
> the baby, placing her chest over the baby and then she says

---

[10]Report of Proceedings at 183-88.

[11]Report of Proceedings at 201. The record does not show how the test actu-
ally came out.

[12]*Id.*

[13]Report of Proceedings at 197, 307.

[14]Report of Proceedings at 299.

[15]Report of Proceedings at 302; *see also* Report of Proceedings at 301, lines
13-14.

she had fallen asleep, and past that point, she couldn't remember anything. And then I asked her, did you intentionally suffocate—or did you suffocate the baby. She says, "It's possible, but I can't remember that," and then she wanted to go home. She was tired, and prior to that point, she stated that what I told you is true, but . . . [it is] possible that I didn't fall asleep immediately afterwards, so what I took it to be is that . . . she continued with the suffocation. That's my gist of what I remember from her.[16]

Also on March 4, Dr. Lacsina performed an autopsy in which he examined Amber's body both externally and internally. While examining externally, he did not "note any sign of injury or bruising,"[17] or "anything that would provide [him] with a means to determine the cause of death[.]"[18] While examining internally, he likewise was unable "to find any evidence of disease or other pathology that would explain the cause of death[.]"[19] While examining internally, the doctor found "some evidence of petechia[e]"—"little tiny pinpoint hemorrhages"—"around the heart and lungs[.]"[20] He apparently did not find petechiae around the face or eyes. He did not think that petechiae around the heart and lungs explained the cause of death—"nobody seems to know exactly what causes these particular hemorrhages," and "they are seen in a variety of situations"[21]—but he did think that petechiae around the heart and lungs "are much less common" in suffocation cases

---

[16]Report of Proceedings at 303-04.

[17]Report of Proceedings at 24.

[18]Report of Proceedings at 24-25.

[19]Report of Proceedings at 25.

[20]*Id.* According to WEBSTER'S THIRD INTERNATIONAL DICTIONARY at 1689 (1981), "petechia" is "one of the minute hemorrhages or purpuric spots that appear on the skin or mucous and serous membranes or within an organ esp. in some infectious diseases (as typhus or typhoid)."

[21]Report of Proceedings at 26.

than in sudden infant death syndrome (SIDS) cases, and that petechiae occur around the heart and lungs in "80 to 85 percent" of SIDS cases.[22]

After his external and internal examinations, Dr. Lacsina spoke with Lopez and Cronk, who told him about the statements Kelly had made. Based on Kelly's statements, Dr. Lacsina then concluded that the cause of Amber's death "was asphyxiation as a result of suffocation or smothering."[23] According to his later testimony:

Q: How was it that you excluded SIDS in this case, as a cause of death?

A: The exclusion of SIDS is based upon the information that I received surrounding the investigation by law enforcement, on the death of Amber Pineda.

Q: So your exclusion of SIDS is based upon what somebody else told you they found in the investigation?

A: That is correct, yes.

Q: In particular, that is based upon what Detective Lopez told you he found in the investigation?

A: Yes.

. . . .

Q: Your exclusion of SIDS is not based upon any medical evidence that you can articulate today in court?

A: That is correct.

Q: And had it not been for the information that you received from Detective Lopez, what would be your diagnosis?

A: If that information is not available . . . then my diagnosis would have been a probable Sudden Infant Death Syndrome.

Q: Is it sufficient for you to exclude SIDS if a police officer comes to you and tells you that he believes it's a suspicious death, without giving you any facts to base his suspicions on?

[22]Report of Proceedings at 36.

[23]Report of Proceedings at 33.

A: No, it's not.

Q: You would require the officer or you would like the officer to bring back specific facts?

A: That is correct, yes.

Q: One of the facts that Detective Lopez brought back to you was an alleged admission by Mrs. Pineda, was it not?

A: Yes.

Q: . . . Do you believe that that's an essential part of the case investigation for you to exclude SIDS?

A: Yes.

Q: So without the statement of Mrs. Pineda, do you believe it's sufficient to exclude SIDS when you have only the items that were enumerated by the prosecutor?

A: No.[24]

On March 27 1998, the State charged Kelly with second degree manslaughter, a class B felony. Under RCW 9A.32-.070, a person commits second degree manslaughter if he or she, with criminal negligence, causes the death of another person. Under RCW 9A.08.010(1)(d), a person is criminally negligent when he or she fails to be aware of a substantial risk that a wrongful act may occur, and the failure constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.

On August 10, 1998, the trial court convened a pretrial hearing on Kelly's motion to dismiss for lack of corpus delicti. Salvador, Lopez, Cronk, and Dr. Lacsina testified as set forth above. Additional witnesses included Professor James Ferris, called by the defense, and Dr. Kenneth Feldman, called by the State.

Professor Ferris testified that he was a professor of forensic pathology at the University of British Columbia. He

[24]Report of Proceedings at 34-35.

had been researching and writing on SIDS for many years. He had performed several hundred SIDS autopsies, and had found petechiae in 96.9 percent of one group of 65 cases. He thought a SIDS death could occur "between one week and one year" of age, although it would generally occur "in the one week to six month period."[25] After reviewing the records of this case, he thought that SIDS, but not suffocation, was likely the cause of Amber's death. He stated in part:

Q: Can you contrast petechial hemorrhages to cases where suffocation is known to be the cause of death?

A: Well the instance in suffocation is very much lower, and the distribution is different. Characteristically in airway obstruction deaths, where there is some form of mechanical obstruction, as say overlaying,[26] then you get petechia[e] on the face and eyes, and also perhaps in the internal organs, but more frequently, you don't find any petechial hemorrhages.

Q: Were there any petechia[e] in the face or eyes in the case of Amber Pineda?

A: None were reported.

Q: And do you have an opinion as to whether the distribution of petechia[e] in this case was more consistent with SIDS or more consistent with death by suffocation or asphyxiation?

A: Well, in my opinion, it was typical of SIDS, and inconsistent—perhaps that's a bit strong, but certainly, atypical of suffocation.

Q: Is a diagnosis of suffocation appropriate in the case of Amber Pineda?

A: Not in my opinion.

Q: Why is that?

---

[25]Report of Proceedings at 256-57.

[26]Throughout the hearing, the parties and witnesses used the term "overlaying" to describe a parent who smothers a child by laying on the child's airway.

A: Because there are no autopsy findings that would suggest it.[27]

Dr. Feldman testified that he practiced general pediatrics at the Odessa Brown clinic in Seattle. He also supervised care in the emergency room at Children's Hospital in Seattle and, since 1983, had been the principal physician involved in child abuse consultations at Children's Hospital. He thought that SIDS was "unusual before a month of age," and that it generally occurred "between about one month and six months of age."[28] Based on the records of this case, he "would [have been] hesitant to . . . label it as SIDS[,]"[29] but he also would have been "hesitant" to say "that Amber died because of smothering or suffocation."[30] He "would have stopped and said it was an asphyxial death or undetermined cause."[31]

On August 14, 1998, the trial court granted Kelly's motion to dismiss for lack of corpus delicti. On September 4, 1998, the trial court entered written findings of fact and conclusions of law, some over the State's objection. On September 24, 1998, the State filed this appeal.

█ The corpus delicti rule requires evidence, independent of the accused's statements, "that a crime was committed by someone."[32] It does not require evidence "of the

---

[27]Report of Proceedings at 257-58.

[28]Report of Proceedings at 343.

[29]Report of Proceedings at 344. The doctor later explained that the nonoccurrence of SIDS in children of less than one month might be due to the way in which medical studies have been done. When asked, "Do you know of any studies that exclude SIDS because of a child's age being under one month?" he responded that "many of the studies have for technical reasons excluded considering kids under a month of age, simply because there may be more confusion of newborn problems." Report of Proceedings at 354.

[30]Report of Proceedings at 352.

[31]*Id.* It is unclear whether "or" is a misprint that should have been "of."

[32]*City of Bremerton v. Corbett*, 106 Wn.2d 569, 574, 723 P.2d 1135 (1986); *see also State v. Ray*, 130 Wn.2d 673, 679, 926 P.2d 904 (1996); *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967); *State v. Meyer*, 37 Wn.2d 759, 763, 226 P.2d

identity of the person who committed the crime."[33] The underlying premise is that the accused's statements, standing alone, are insufficient to support an inference that the crime was committed.[34]

■■ The State has the burden of producing evidence sufficient to satisfy the corpus delicti rule.[35] Because its burden is one of production as opposed to one of persuasion,[36] it need only produce evidence sufficient to support a finding that someone committed a crime. A trial or appellate court considering whether the State has met this burden must take the evidence and reasonable inferences in the light most favorable to the State.[37] Thus, an appel-

204 (1951); *State v. Solomon*, 73 Wn. App. 724, 728, 870 P.2d 1019, *review denied*, 124 Wn.2d 1028 (1994); 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 1.4(b) at 24 (1986) (rule "embraces the fact that a crime has been committed by someone").

[33]*Corbett*, 106 Wn.2d at 574; *see also Meyer*, 37 Wn.2d at 763; *Solomon*, 73 Wn. App. at 728; *State v. Neslund*, 50 Wn. App. 531, 542, 749 P.2d 725, *review denied*, 110 Wn.2d 1025 (1988); 1 LAFAVE & SCOTT, *supra*, § 1.4(b) at 24.

[34]*State v. Aten*, 130 Wn.2d 640, 655-56, 927 P.2d 210 (1996); *State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995); *State v. Smith*, 115 Wn.2d 775, 780-81, 801 P.2d 975 (1990); *Corbett*, 106 Wn.2d at 574-75 (quoting *Meyer*, 37 Wn.2d at 763); *Lung*, 70 Wn.2d at 371-72; *Meyer*, 37 Wn.2d at 763.

[35]*Ray*, 130 Wn.2d at 679; *Vangerpen*, 125 Wn.2d at 796 (quoting *Smith*, 115 Wn.2d at 781); *State v. Riley*, 121 Wn.2d 22, 32, 846 P.2d 1365 (1993); *Smith*, 115 Wn.2d at 781, 782; *Corbett*, 106 Wn.2d at 574-75 (quoting *Meyer*, 37 Wn.2d at 763-64), 578-79; *Meyer*, 37 Wn.2d at 763-64; *Solomon*, 73 Wn. App. at 727; *Neslund*, 50 Wn. App. at 542, 543-44; *see also Aten*, 130 Wn.2d at 656, (rule requires evidence that "would support a logical and reasonable inference"), 658 ("In assessing whether there is sufficient evidence of the corpus delicti, independent of a defendant's statements, this Court assumes the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State.").

[36]*Ray*, 130 Wn.2d at 679; *Vangerpen*, 125 Wn.2d at 796 (quoting *Smith*, 115 Wn.2d at 781); *Riley*, 121 Wn.2d at 32; *Smith*, 115 Wn.2d at 781, 782; *Corbett*, 106 Wn.2d at 574-75 (quoting *Meyer*, 37 Wn.2d at 763-64), 578-79; *Meyer*, 37 Wn.2d at 763-64; *Solomon*, 73 Wn. App. at 727; *Neslund*, 50 Wn. App. at 542, 543-44; *see also Aten*, 130 Wn.2d at 656, (rule requires evidence that "would support a logical and reasonable inference"), 658 ("In assessing whether there is sufficient evidence of the corpus delicti, independent of a defendant's statements, this Court assumes the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State.").

[37]*Ray*, 130 Wn.2d at 679; *Aten*, 130 Wn.2d at 658; *Smith*, 115 Wn.2d at 782 n.1; *Corbett*, 106 Wn.2d at 571; *Lung*, 70 Wn.2d at 372; *Solomon*, 73 Wn. App. at 727; *Neslund*, 50 Wn. App. at 544.

late court engages in the same inquiry as the trial court[38] (i.e., reviews "de novo"[39]). As we recently explained:

> The reason a trial court is charged with determining sufficiency is so that it will not encroach on the fact-finding function of the jury. If the trial court should not encroach, the appellate court should not either. Thus, when the trial court is limited to deciding sufficiency, the appellate court should be also. Perhaps the most common example of this reasoning is the summary judgment process, where both trial and appellate courts perform the same function—deciding sufficiency.[40]

The State does not dispute this description of the law. Citing *State v. Aten*,[41] it agrees that it "must present evidence, independent of any statement of the defendant, which need only support a logical and reasonable inference that the death was caused by a criminal act."[42] It further agrees that "the court is obligated to interpret such evidence in a light most favorable to the State."[43]

The State does dispute the way in which the trial court applied the law to the facts of this case. We discuss four of its arguments.

■ The State first argues that the trial court erred by entering certain findings of fact. Findings are needed when a trial court is asked to resolve conflicts in the evidence by weighing the evidence; without such findings, the parties and a reviewing court have no way to know what the trial

---

[38]*Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 690, 974 P.2d 836 (1999); *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

[39]*Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993); *Ski Acres, Inc. v. Kittitas County*, 118 Wn.2d 852, 854, 827 P.2d 1000 (1992); *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 169, 736 P.2d 249 (1987).

[40]*State v. Karpenski*, 94 Wn. App. 80, 104 n.102, 971 P.2d 553 (1999).

[41]*State v. Aten*, 130 Wn.2d 640, 927 P.2d 210 (1996).

[42]Br. of Appellant at 17; *see also id.* at 10.

[43]*Id.* at 17.

court believed the facts to be.[44] Findings are not needed when a trial court is asked to resolve conflicts in the evidence by viewing the evidence in the light most favorable to one party; with or without findings, the evidence speaks for itself.[45] As already seen, a trial court applying the corpus delicti rule must resolve conflicts in the evidence by taking the evidence in the light most favorable to the State. Necessarily then, the findings made here are immaterial.

■ The State next argues that the trial court erred by failing to consider Dr. Lacsina's opinion that the cause of Amber's death "was asphyxiation as a result of suffocation or smothering."[46] As already seen, the corpus delicti rule must be met by evidence "independent of" the defendant's statements.[47] An expert opinion based wholly on the defendant's statements is not "independent of" those state-

---

[44]*E.g., State v. Head*, 136 Wn.2d 619, 621-23, 964 P.2d 1187 (1998); CrR 6.1(d).

[45]*Duckworth v. City of Bonney Lake*, 91 Wn.2d 19, 21-22, 586 P.2d 860 (1978) ("The function of a summary judgment proceeding is to *determine whether a genuine issue of material fact exists. It is not . . . to resolve issues of fact or to arrive at conclusions based thereon.* Consequently, the finding of fact and conclusions of law entered . . . are superfluous[.]") (citation omitted); *State ex rel. Zempel v. Twitchell*, 59 Wn.2d 419, 424-25, 367 P.2d 985 (1962) ("The function of a summary judgment proceeding . . . is to determine whether or not a genuine issue of fact exists, not to determine issues of fact. Assuming, *arguendo*, that the trial court granted a summary judgment, findings and conclusions were unnecessary."); *In re Marriage of Stern*, 68 Wn. App. 922, 929 n.5, 846 P.2d 1387 (1993) ("[T]rial court does not evaluate and balance the evidence but must view all evidence in the light most favorable to the nonmoving party. The trial court is entirely precluded from resolving material issues of fact. It is well established that in summary judgment proceedings the trial court need not even enter findings and conclusions; they are superfluous and are not considered on appeal."); *Donald v. City of Vancouver*, 43 Wn. App. 880, 883, 719 P.2d 966 (1986) ("Findings of fact . . . are not necessary on summary judgment . . . and, if made, are superfluous and will not be considered by the appellate court.") (citation omitted).

[46]Report of Proceedings at 33.

[47]*Ray*, 130 Wn.2d at 679; *Corbett*, 106 Wn.2d at 574; *Lung*, 70 Wn.2d at 371; *Meyer*, 37 Wn.2d at 763; *Solomon*, 73 Wn. App. at 728; 1 LaFave & Scott, *supra*, § 1.4(b) at 24.

ments.[48] Because Dr. Lacsina's opinion was based wholly on Kelly's statements,[49] it cannot be used to satisfy the corpus delicti rule, and the trial court acted properly by not considering it.

The State next argues that the trial court erred by considering Professor Ferris' opinion that Amber's death was "typical of SIDS" and "certainly [ ] atypical of suffocation."[50] We agree to the extent that Professor Ferris' opinion conflicted with evidence or reasonable inferences favorable to the State, because the trial court was obligated to view the evidence in the light most favorable to the State.[51] We disagree to the extent that Professor Ferris' opinion did not conflict with evidence or reasonable inferences favorable to the State. Purely for convenience, we will assume that all of Professor's Ferris' testimony conflicted with evidence or reasonable inferences favorable to the State; that the trial court should not have considered any of it; and that we should not consider any of it.

Lastly and most importantly, the State argues that the trial court erred "by ignoring"[52] the evidence independent of Kelly's statements, to wit: that Amber was nine days old at the time of death; that Amber seemed healthy just before her death; that Dr. Lacsina found nothing in his autopsy; that Kelly was present and fully dressed at the time of Amber's death; and that Kelly did not show emotion after Amber's death. These facts, without more, do not support a

---

[48]If this were not true, the State could easily circumvent the corpus delicti rule by having an expert form an opinion based solely on the defendant's statement, then offering the opinion in lieu of the statement.

[49]The State acknowledges that Dr. Lacsina's "conclusion was dependent to some extent upon the police reports from the death investigation which included the admissions of the defendant." Br. of Appellant at 12. It goes on, however, to assert that "this cannot be considered an improper use of the defendant's statements in a corpus delicti evaluation." Id. It fails to support its assertion with either citation or argument.

[50]Report of Proceedings at 258.

[51]Ray, 130 Wn.2d at 679; Aten, 130 Wn.2d at 658; Smith, 115 Wn.2d at 782 n.1; Corbett, 106 Wn.2d at 571; Lung, 70 Wn.2d at 372; Solomon, 73 Wn. App. at 727; Neslund, 50 Wn. App. at 544.

[52]Br. of Appellant at 2, 15.

logical and reasonable inference that anyone committed a crime, or that Amber's death was the result of a criminal act. Thus, we conclude that the State failed to satisfy the corpus delicti rule, and that the trial court properly dismissed the case.

Affirmed.

SEINFELD and HUNT, JJ., concur.