[No. 67320-9. En Banc.]

Argued June 15, 1999.     Decided September 9, 1999.

THE STATE OF WASHINGTON, *Respondent*, v. JORGE LUIS BUSTAMANTE-DAVILA, *Petitioner.*

*John A. Hays*, for petitioner.

*James J. Stonier, Prosecuting Attorney*, and *Christopher T. Mahre* and *Edwin N. Norton, Deputies*, for respondent.

Sᴍɪᴛʜ, J. — Petitioner Jorge Luis Bustamante-Davila seeks discretionary review of an unpublished decision of the Court of Appeals, Division Two, affirming his conviction for unlawful possession of a firearm in the second degree under RCW 9.41.040(1)(b). The Court of Appeals concluded the firearm was not seized illegally by police officers who permissively entered Petitioner's mobile home with an Immigration and Naturalization Service agent, under a presumptively valid deportation order, although Petitioner was not informed he had a right to refuse entry into his home. We affirm.

## QUESTION PRESENTED

The question presented in this case is whether, under

*State v. Ferrier,*[1] a firearm was illegally seized from Petitioner's mobile home after he granted entry to a United States Immigration and Naturalization Service agent accompanied by local police officers to serve a deportation order issued by an immigration judge when Petitioner was not advised of his right to refuse entry.

## STATEMENT OF FACTS

On March 5, 1997, an agent of the United States Immigration and Naturalization Service (INS) went to Petitioner's mobile home in Kelso, Cowlitz County, to arrest him under a "removal order" issued by an immigration judge.[2] At the time, the INS agent did not know Petitioner had filed a timely appeal on February 27, 1997[3] and that a stay had been granted.[4] The agent did not know why notification of the appeal had not reached him.[5] He had no arrest warrant, but was "going on the order of the immigration judge."[6] The State was not certain whether the INS agent had authority to arrest Petitioner for the immigration violation, although the agent in good faith be-__

---

[1] 136 Wn.2d 103, 960 P.2d 927 (1998).

[2] Report of Proceedings at 20-21 (Apr. 8, 1997). The order was based upon Petitioner's arrest in 1995 for the immigration violation of illegal reentry into the United States after deportation. *Id.* at 20-21.

[3] *Id.* at 21, 27, 30. The agent testified the order was in Petitioner's file which he had since March 4, 1997. *Id.* at 25. The appeal was not in the file. *Id.* at 21. He had possession of Petitioner's "A-file" which on March 5, 1997 contained no reference to an appeal. Notice of the appeal was not placed in the file until after the arrest on that date. *Id.* at 27. An "A-file" is the official INS "alien registration file" and contains "the history of all of the proceedings and all and any applications that the subject may make to the [INS]." *Id.* at 22. The appeal was filed February 27, 1997. *Id.* at 27. The INS agent did not learn of the appeal until March 7, 1997. *Id.* at 27-28.

[4] *Id.* at 21. None of the immigration documents are in the record.

[5] *Id.* at 28.

[6] *Id.* at 25. The court in the suppression hearing concluded "there was no lawful basis to arrest the defendant for an immigration violation because the deportation order was pending appeal." Findings of Fact and Conclusions of Law Re: Suppression Hearing at 3.

lieved he did have authority when he went to Petitioner's residence.[7]

The INS agent testified it was his normal practice to ask for "backup" from local law enforcement officers.[8] He had requested assistance that day because he had a number of cases in the area.[9] He was accompanied to Petitioner's residence by at least four law enforcement officers from the Cowlitz County Sheriff's office and Longview Police Department.[10] At least one officer testified he had been told Petitioner was to be deported.[11]

The INS agent knocked at the door of Petitioner's residence (a single-wide mobile home).[12] When Petitioner came to a window, the agent showed him his badge.[13] Petitioner testified he recognized the agent.[14] Petitioner testified he also saw police officers from the window.[15] Petitioner opened the door.[16] At the suppression hearing in the Cowlitz County Superior Court on April 14, 1997 the Honorable Don L. McCulloch made a finding of fact that the INS agent "asked permission to enter and the defendant responded af-

[7]Report of Proceedings at 18 (Apr. 8, 1997).

[8]*Id.* at 33.

[9]*Id.* at 32.

[10]*Id.* at 4-5 (Apr. 14, 1997). A detective from the Cowlitz County Sheriff's office testified at the suppression hearing that there were a couple of deputies from the sheriff's office and some officers from the Longview Police Department. He stated "There were quite a few people." *Id.* He estimated that there were possibly five altogether. *Id.* at 10. The INS agent testified he was "backed up by at least two other police officers" and another INS agent and another police officer were at the rear of the residence. *Id.* at 23.

[11]*Id.* at 6 (Apr. 14, 1997).

[12]*Id.* at 22.

[13]*Id.* at 22-23 (Apr. 14, 1997).

[14]The INS agent testified he had "encountered" Petitioner before March 5, 1997. *Id.* at 20. He had arrested Petitioner for reentering the country illegally in 1995. *Id.*

[15]*Id.* at 16.

[16]Findings of Fact and Conclusions of Law Re: Suppression Hearing at 2.

firmatively stepping back."[17] The agent also testified that "at least two other County officers" were standing with him when he asked for consent to enter.[18] Petitioner testified he replied, "Yeah. You can come."[19] Petitioner stepped aside, and the INS agent and law enforcement officers entered.[20] After hearing voices inside the mobile home, the police officer at the rear of the home came to the front and entered.[21]

After the INS agent entered the residence, he told Petitioner he was under arrest for an immigration violation.[22] The agent told Petitioner to gather any belongings he might want because he would probably not be returning to his home.[23] As the agent followed Petitioner back to his bedroom, he noticed a rifle leaning against a wall of the living room.[24] The agent knew Petitioner was not a United States citizen, had been deported, and had unlawfully reentered the country, and therefore was not lawfully permitted to possess a firearm.[25] A Longview police officer who entered with the agent also observed "the rifle standing against the west living room wall in plain view."[26] He called it to the attention of the officer who had initially been outside at the rear of the residence but later entered

[17]*Id.* at 2.

[18]Report of Proceedings at 29-30 (Apr. 8, 1997). The INS agent testified he believed Petitioner could see all of them when he opened the door. *Id.* The sole disputed finding of fact in the suppression hearing was whether a certain police officer was standing "right next" to the INS agent at the front door and in "immediate view" of Petitioner when the agent asked for permission to enter. Findings of Fact and Conclusions of Law Re: Suppression Hearing at 3.

[19]Report of Proceedings at 15 (Apr. 14, 1997).

[20]*Id.* at 41 (Apr. 8, 1997).

[21]*Id.* at 6 (Apr. 14, 1997).

[22]*Id.* at 23. The immigration offense is not otherwise identified in the record.

[23]Findings of Fact and Conclusions of Law Re: Suppression Hearing at 2.

[24]Report of Proceedings at 24 (Apr. 8, 1997). *See also* Findings of Fact and Conclusions of Law Re: Suppression Hearing at 2.

[25]*Id.* at 2.

[26]*Id.*

it.[27] This officer "asked the defendant if the rifle was his and Petitioner acknowledged it was."[28] This officer "knew that the defendant was both an alien and a convicted felon."[29]

Petitioner was initially charged on March 5, 1997 with unlawful possession of a firearm in the first degree (by a convicted felon). The prior felony conviction was for rape of a child in the third degree.[30] The charge was later amended on May 12, 1997 to unlawful possession of a firearm in the second degree under RCW 9.41.040(1)(b).[31]

RCW 9.41.040(1)(a) and (b) read:

**Unlawful possession of firearms—Ownership, possession by certain persons.** (1)(a) A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the first degree, if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted in this state or elsewhere of any serious offense as defined in this chapter.

(b) A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under (a) of this subsection for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm:

(i) After having previously been convicted in this state or elsewhere of any felony not specifically listed as prohibiting firearm possession under (a) of this subsection, or any of the following crimes when committed by one family or household member against another, committed on or after July 1, 1993: Assault in the fourth degree, coercion, stalking, reckless

---

[27]*Id.*

[28]*Id.* at 2-3.

[29]*Id.* at 3. *See also* Report of Proceedings at 43 (Apr. 8, 1997). The word "alien" is used in testimony and in statutes to refer to persons born in another country who are not citizens of the United States. Our preferred reference is "foreign nationals" or "non-citizens."

[30]Clerk's Papers at 1-2.

[31]*Id.* at 10. The statute and charge make no reference to immigration status.

endangerment, criminal trespass in the first degree, or violation of the provisions of a protection order or no-contact order restraining the person or excluding the person from a residence (RCW 26.50.060, 26.50.070, 26.50.130, or 10.99.040).

. . . .

The amended Information filed by the Prosecuting Attorney on May 13, 1997 read:

COMES NOW JAMES J. STONIER, Prosecuting Attorney of Cowlitz County, State of Washington, and by this Information accuses the above-named defendant(s) of violating the criminal laws of the State of Washington as follows:

## UNLAWFUL POSSESSION OF A FIREARM
## IN THE SECOND DEGREE

The defendant, in the County of Cowlitz, State of Washington, on or about March 5, 1997, after having been previously convicted of Rape of a Child in the Third Degree, a serious offense, on April 15, 1992, did feloniously possess a firearm, to-wit: a.303 Caliber Withgow bolt action rifle; contrary to RCW 9.41.040(1)(b) and against the peace and dignity of the State of Washington.

On April 8, 1997, Petitioner moved to suppress the evidence, claiming his arrest was illegal.[32] The trial court denied his motion.[33] Although the court concluded the INS agent did not in fact have "lawful authority" to arrest Petitioner, the court concluded Petitioner nevertheless did give consent for entry to his residence by both the agent and the police officers.[34] The court also concluded the firearm was in "plain view,"[35] and because Petitioner was

[32]*Id.* at 4-8.

[33]Findings of Fact and Conclusions of Law Re: Suppression Hearing at 1-4.

[34]*Id.* at 3.

[35]*Id.*

not a citizen and was a convicted felon, there was probable cause to arrest him.[36]

The trial court, the Honorable Don L. McCulloch, ruling on the suppression motion, on June 21, 1997 rendered the following undisputed findings of fact:

1. That on March 5, 1997 INS agent Shephard went to the home of the defendant at 1450 Westside Hwy #38, in Kelso, a single wide trailer, to make an arrest for suspected violation of immigration laws.

2. That Agent Shephard knew that the defendant had been deported in the past and that another deportation order had been entered on the defendant by an Immigration Court.

3. That on March 5, 1997, Agent Shephard was unaware that an appeal had been filed by the defendant on the deportation order.

4. That Agent Shephard did not have an arrest warrant for the defendant. His intention was to make an arrest on the deportation order after obtaining consent to enter the defendant's residence.

5. That Agent Shephard was assisted by local law enforcement officials as back up.

6. That Agent Shephard knocked on the door of the residence. The defendant opened the door. Agent Shephard asked permission to enter and the defendant responded affirmatively stepping back. Agent Shephard spoke in English because he knew that the defendant could speak and understand English based on prior conversations with him.

7. That after entry, Agent Shephard informed the defendant that he was being arrested on an Immigration violation. The defendant was told he should go get his clothes because he would not be returning to the residence. The defendant then went to the back of the trailer to the bedroom.

8. That while following the defendant to the back bedroom, Shephard noticed a rifle leaning against the living room wall. Shephard knew that the defendant was an alien and not allowed to possess a firearm.

---

[36]*Id.* at 3-4.

9. That Longview Officer Ray Hartley also entered the residence from the front door and observed the rifle standing against the west living room wall in plain view.

10. That Hartley pointed out the rifle to Deputy Conner who had entered the residence through the open front door. Deputy Conner asked the defendant if the gun was his to which he acknowledged that it was. Deputy Conner knew that the defendant was both an alien and a convicted felon.

11. That the defendant was arrested on an immigration offense as well as the unlawful possession of a firearm charge.[37]

The court in its order stated the only disputed finding of fact:

1. That when Agent Shepard asked for permission to enter the residence, Officer Hartley was standing right next to him and both were in the immediate view of the defendant.

The trial court then rendered the following conclusions of law and its order:

### III. CONCLUSIONS OF LAW

1. That Agent Shephard did not have lawful authority to arrest the defendant on an immigration violation because there was a valid pending appeal on the deportation order.

2. That Agent Shephard and back up officers could lawfully approach the defendant's home and ask permission to enter.

3. That the defendant gave permission to Agent Shephard to enter the residence. The defendant also gave permission to the officer standing next to Shephard by virtue of his knowledge that both officers were together and he did not limit his consent to only Officer Shephard.

4. That the rifle was observed in plain view and was properly seized as evidence.

5. That there was no lawful basis to arrest the defendant for an immigration violation because the deportation order was pending appeal.

---

[37]Findings of Fact and Conclusions of Law Re: Suppression Hearing at 1-3. The oral ruling on the suppression motion was made on May 6, 1997. *Id.* at 8.

6. That the arrest of the defendant was lawful because probable cause existed to arrest the defendant for the crime of Unlawful Possession of a Firearm and/or Illegal Possession of a Firearm by an Alien at the time he was arrested.

BASED ON THE FOREGOING Conclusion of Law, the Court now enters the following:

## ORDER

That evidence seized from the defendant's home is admissible at trial.

s/Don L. McCulloch

Judge

In a non-jury trial on stipulated facts before Judge James E. Warme, Petitioner was convicted of unlawful possession of a firearm in the second degree on May 14, 1997.[38]

Petitioner on May 14, 1997 appealed his conviction to the Court of Appeals, Division Two.[39] He argued his right to privacy had been violated under both the United States and Washington Constitutions[40] and that his consent for entry to his residence was not freely and voluntarily given.[41] In addition, he contended the search exceeded the scope of consent.[42]

On September 11, 1998, in an unpublished decision, the Court of Appeals, Division Two, the Honorable Karen G. Seinfeld writing, affirmed Petitioner's conviction.[43] The court stated "where a defendant does not claim at the suppression hearing to have been coerced, and where testimony does not otherwise suggest coercion, the mere fact that the police did not give *Miranda* warnings or advise the resi-

---

[38]Clerk's Papers at 13-14.

[39]Notice of Appeal to Court of Appeals (May 14, 1997).

[40]*See* Br. of Appellant at 12-18.

[41]*See id.* at 19-23.

[42]*See id.* at 22-28.

[43]*State v. Bustamante-Davila* No. 22023-7-II (Wash. Ct. App. Sept. 11, 1998).

dent of his right to refuse consent will not negate the consent."[44] The court concluded the search did not exceed the scope of consent.[45]

On September 21, 1998, Petitioner filed a motion for reconsideration.[46] He contended that under *State v. Ferrier*[47] (decided after the Court of Appeals' decision in this case) the fact that he had not been informed of his right to refuse entry vitiated any consent he had given.[48]

On October 2, 1998, the Court of Appeals, Acting Chief Judge C.C. Bridgewater writing, denied Petitioner's motion.[49] The court noted Petitioner had not discussed the *Gunwall* factors in either his brief or motion for reconsideration.[50] The court concluded Petitioner's case was distinguishable from *Ferrier* because, unlike in that case, police officers in this case had not engaged in a true "knock and talk" procedure with Petitioner.[51] Instead of seeking entry to search for contraband, "they came to execute a federal order for the appellant's arrest and deportation."[52]

Petitioner filed a petition with this court seeking review of the decision of the Court of Appeals. Review was granted on April 6, 1999.

## DISCUSSION

█ The principal issue presented for review in this case

---

[44]*Bustamante-Davila*, No. 22023-7-II, slip op. at 5 (citing *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990)). *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

[45]*Id.* at 6.

[46]Mot. for Recons. (Sept. 21, 1998).

[47]136 Wn.2d 103, 960 P.2d 927 (1998).

[48]Mot. for Recons. at 5.

[49]Order Denying Mot. for Recons. (Oct. 2, 1998).

[50]*Id.* at 1. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

[51]*Id.*

[52]Order Denying Mot. for Recons. (Oct. 2, 1998).

is whether under this court's decision in *State v. Ferrier*[53] evidence (a rifle) was illegally seized in Petitioner's home after permissive entry by police officers accompanying a United States Immigration and Naturalization Service agent because Petitioner was not informed of his right to refuse entry. Petitioner has not assigned error to any findings of fact from the suppression hearing or from the trial. Consequently, they are considered as verities on appeal.[54]

Petitioner does not argue that the INS agent did not have authority to arrest him without a warrant, although the trial court questionably concluded the agent did not have authority to arrest Petitioner because of the appeal and stay order. The United States Supreme Court in *Reno v. Flores*.[55] announced the general authority for INS agents to arrest without a warrant:

> Though a procedure for obtaining warrants to arrest named individuals is available, see 8 U.S.C. § 1252(a)(1); 8 CFR § 242.2(c)(1) (1992), the deportation process ordinarily begins with a warrantless arrest by an INS officer who has reason to believe that the arrestee "is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained," 8 U.S.C. § 1357(a)(2). Arrested aliens are almost always offered the choice of departing the country voluntarily, 8 U.S.C. § 1252(b) (1988 ed., Supp. III); 8 CFR § 242.5 . . . .

In *State v. Ferrier*, this court announced an explicit rule for "knock and talk" procedures employed by law enforcement officers seeking to search a home without a warrant.[56] In a "knock and talk" procedure, not having obtained a search warrant, police officers proceed to premises where

---

[53]136 Wn.2d 103.

[54]*State v. Stenson*, 132 Wn.2d 668, 697, 940 P.2d 1239 (1997).

[55]507 U.S. 292, 307, 113 S. Ct. 1439, 1449, 123 L. Ed. 2d 1 (1993).

[56]Charles W. Johnson, *Survey of Washington Search and Seizure Law: 1998 Update*, 22 Seattle U. L. Rev. 337, 494 (1998).

they believe contraband will be found.[57] Once there they knock on the door and talk with the resident, asking if they may enter.[58] After being allowed to enter, the officers then explain why they are there, that they have no search warrant, and ask permission to search the premises.[59]

In *Ferrier*, the police officers had reason to suspect marijuana was being grown in a private residence.[60] They went to the residence without a search warrant intending to follow a "knock and talk" procedure.[61] Although accounts differed concerning words actually spoken,[62] the officers obtained the resident's consent to enter and obtained her signature on a "consent to search" form which "did not indicate she had the right to refuse consent to the search."[63] She was not told by the officers she could refuse to consent nor was she informed of any other rights.[64] After marijuana plants were seized from her residence, the defendant moved to suppress the evidence.[65] The motion was denied. She was convicted in the Kitsap County Superior Court of manufacturing a controlled substance. The Court of Appeals affirmed her conviction.[66]

This court reversed, basing its conclusion on article I, section 7 of the Washington Constitution which provides "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." This court examined the *Gunwall* factors to determine whether the state constitution provided greater protection of the defend-

---

[57]*Ferrier*, 136 Wn.2d at 106.

[58]*Id.*

[59]*Id.*

[60]*Id.*

[61]*Id.* at 107.

[62]*Id.* at 107-08.

[63]*Id.* at 108.

[64]*Id.*

[65]*Id.* at 109.

[66]*Id.*

ant's privacy interest than the federal constitution.[67] Concluding that it did, the court stated

> While we recognize that a home dweller should be permitted to voluntarily consent to a search of [the dweller's] home, the waiver of the right to require production of a warrant must, in the final analysis, be the product of an informed decision. We, therefore, adopt the following rule: *that when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that [the person] may lawfully refuse to consent to the search* and that [the person] can revoke, at any time, the consent [that person gives], and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.[68]

Petitioner challenges the validity of his consent under *State v. Ferrier*, contending this court, as it did in *Ferrier*, should make a determination based on independent state constitutional grounds.[69]

■ ■ When the issue of broader state constitutional protections arises, the party seeking that broader protection must discuss reasons for reading the state provision differently from its federal counterpart.[70] In denying Petitioner's motion for reconsideration in this case, the Court of Appeals noted the absence of such discussion in Petitioner's brief and in his motion for reconsideration.[71] This court will not consider whether there is greater protection under the state constitution if the issue is not adequately presented and argued with examination of the

---

[67]*Id.* at 111-14.

[68]*Id.* at 118-19 (emphasis added).

[69]Pet. for Review at 14.

[70]*State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

[71]Order Denying Mot. for Recons. (Oct. 2, 1998).

*Gunwall* factors.[72] Petitioner discussed the *Gunwall* factors in his petition for review to this court.[73] This court may thus consider his claim under the state constitution.[74]

In the article I, section 7 context, it is necessary only to examine the fourth and sixth *Gunwall* factors as they apply to this case.[75] The fourth factor requires a *consideration of preexisting state law*.[76] Petitioner contends case law demonstrates "a concern of our state's citizenry relating to privacy in their homes that supports review on state grounds."[77] He cites *State v. Young*[78] which held that infrared surveillance of a residence violated the state constitution's protection against warrantless invasion of the home. This court stated "Our decisions have consistently reflected the principle that the home receives heightened constitutional protection. . . . In no area is a citizen more entitled to his privacy than in his home."[79] Thus, preexisting state law would support independent review of Petitioner's case under *Gunwall*.

The sixth *Gunwall* factor requires a consideration of *whether the privacy interest in the case is a matter of particular local concern*.[80] Petitioner contends that it is, relying solely upon this court's decision in *Young*.[81]

---

[72]*State v. Wethered*, 110 Wn.2d 466, 473, 755 P.2d 797 (1988).

[73]Pet. for Review at 14-17.

[74]*See State v. McFadden*, 63 Wn. App. 441, 445-46, 820 P.2d 53 (1991), *review denied*, 119 Wn.2d 1002, 832 P.2d 487 (1992).

[75]*State v. Boland*, 115 Wn.2d 571, 576, 800 P.2d 1112 (1990). *Gunwall* sets forth six nonexclusive factors to determine whether broader protection is available under the Washington Constitution: (1) the text of the state constitution, (2) differences in text between the state and federal constitutions, (3) state constitutional and common law history, (4) *preexisting state law*, (5) differences in structure between federal and state constitutions, and (6) *matters of particular state interest or local concern*. 106 Wn.2d at 61-62.

[76]*Gunwall*, 106 Wn.2d at 61-62.

[77]Pet. for Review at 15.

[78]123 Wn.2d 173, 867 P.2d 593 (1994).

[79]*Id*. at 185.

[80]*Gunwall*, 106 Wn.2d at 62.

[81]Pet. for Review at 16.

In *Ferrier,* this court stated that *Young* stands for the proposition "that the degree of privacy a Washington citizen has in the home is primarily a local concern, and that there is no need for national uniformity on this issue."[82] The court emphasized in *Ferrier* that the "core of [defendant's] argument" was that police officers

> violated her expectation of privacy in her home *because they conducted the knock and talk in order to search her home, thereby avoiding the general requirement that a search warrant be obtained. . . .* This right is clearly an interest of local concern under the sixth *Gunwall* factor due to "[t]he heightened protection afforded state citizens against an unlawful intrusion into private dwellings [that] places an onerous burden upon the government *to show a compelling need to act outside of our warrant requirement.*"[83]

█ Under the facts in this case, police officers did not go to Petitioner's home to search for contraband without a search warrant. Petitioner has not demonstrated that the facts in this case present an issue of particular local concern.

This court limited its holding in *Ferrier* to employment of a "knock and talk" procedure. No such procedure was involved in this case. The police officers in this case did not proceed to Petitioner's residence with the intent to find contraband without obtaining a search warrant. They merely accompanied the INS agent as backup, a standard practice in INS arrest and deportation matters.[84] Petitioner did not consent to a search, but consented to entry into his home by the INS agent who in good faith believed he was executing a presumptively valid deportation order issued by an immigration judge under established INS procedures.

---

[82]*Ferrier,* 136 Wn.2d at 112.

[83]*Id.* at 114 (quoting *State v. Chrisman,* 100 Wn.2d 814, 822, 676 P.2d 419 (1984)).

[84]Report of Proceedings at 18 (Apr. 8, 1997).

Petitioner at least impliedly consented to entry by the local police officers accompanying the INS agent.

■ Under the facts in this case, *Ferrier* is distinguishable. In this case, there is the unchallenged finding of fact that Petitioner allowed the INS agent to enter his home.[85] The INS agent testified that the police officers with him at the front of the house were within view of Petitioner when he came to the window.[86] When Petitioner stepped back from the open door and did not object to the police officers entering with the INS agent, he impliedly gave consent to their entry. Although the officers testified Petitioner did not expressly consent to their entry, Petitioner could have objected to their entering his residence. He did not object.[87] Under these circumstances, the fact that he did not expressly object "amounted to an implied waiver of [his] right to exclude them."[88]

■ ■ Because the police officers did not employ a "knock and talk" procedure in this case, the court employs a "totality of circumstances" test to determine whether the consent was valid. The State has the burden of demonstrating the voluntariness of the consent.[89] To be valid, the consent must be voluntary and the search must not have exceeded the scope of consent.[90] Whether consent is freely given is a question of fact dependent upon the totality of the circumstances[91] which includes "(1) whether *Miranda* warnings had been given prior to obtaining consent; (2) the degree of education and intelligence of the consenting person; and (3) whether the consenting person had been

---

[85]Findings of Fact and Conclusions of Law Re: Suppression Hearing at 2. *See also* Report of Proceedings at 15 (Apr. 14, 1997).

[86]*Id.* at 30 (Apr. 8, 1997).

[87]*See State v. Raines*, 55 Wn. App. 459, 462, 778 P.2d 538 (1989), *review denied*, 113 Wn.2d 1036, 785 P.2d 825 (1990).

[88]*Id.*

[89]*State v. Shoemaker*, 85 Wn.2d 207, 210, 533 P.2d 123 (1975).

[90]*State v. Hastings*, 119 Wn.2d 229, 234, 830 P.2d 658 (1992).

[91]*Shoemaker*, 85 Wn.2d at 211-12.

advised of his right to consent."[92] No one factor is dispositive.[93]

Although Petitioner was not informed of his right to refuse entry, he consented to entry into his residence by the INS agent and did not object to entry by the police officers accompanying the agent. There was no drawing of weapons by either the agent or the police officers, nor was Petitioner ordered to open the door. In addition, it is evident from Petitioner's testimony that he is a person of at least average or higher intelligence.

A search exceeding the scope of consent is invalid.[94] After the INS agent and police officers entered Petitioner's residence they observed in plain view a rifle leaning against a wall of the living room.[95] There was no search, but there was a seizure. Being aware that Petitioner was both an undocumented non-citizen and a convicted felon who may not lawfully possess a firearm, one of the police officers seized the rifle.[96] "Under the plain view doctrine, an officer must: (1) have a prior justification for the intrusion; (2) inadvertently discover the incriminating evidence; and (3) immediately recognize the item as contraband."[97] Petitioner did not assign error to the finding of fact that the INS agent saw the rifle in plain view. That finding is a verity on appeal.[98] Under 18 U.S.C. § 922(g)(5), it is unlawful for a foreign national who is unlawfully in the United States to possess a firearm.[99] The INS agent had the authority to

[92]*Id.* at 212.

[93]*State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990).

[94]*State v. Murray*, 84 Wn.2d 527, 527 P.2d 1303 (1974).

[95]Findings of Fact and Conclusions of Law Re: Suppression Hearing at 2.

[96]*Id.* at 2-3.

[97]*State v. Myers*, 117 Wn.2d 332, 346, 815 P.2d 761 (1991).

[98]*Stenson*, 132 Wn.2d at 697.

[99]18 U.S.C. § 922(g)(5)(A) states: "It shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting com-

seize the weapon in plain view. There was no search, but assuming there was, it did not exceed the scope of consent.

In *Ferrier,* this court concluded that when police officers employ a "knock and talk" procedure, article I, section 7 of the state constitution requires that the person whose consent is sought be informed of the right to refuse entry. No "knock and talk" procedure was employed in this case. Consequently, the fact police officers did not inform Petitioner of his right to refuse entry did not vitiate his consent to their entry.

## SUMMARY AND CONCLUSIONS

The Court of Appeals affirmed the conviction in the Cowlitz County Superior Court of Petitioner Jorge Luis Bustamante-Davila for one count of unlawful possession of a firearm in the second degree under RCW 9.41.040(1)(b). The offense was based upon the fact that Petitioner was a convicted felon who had a firearm—a rifle—in his possession. The Court of Appeals concluded the evidence (the firearm—a rifle) was properly admitted because Petitioner's consent to entry into his residence had been freely and voluntarily given and the plain view seizure of the firearm had not exceeded the scope of that consent.

Petitioner contends his consent was vitiated because the police officers did not comply with *State v. Ferrier.* In that case this court concluded that when police officers employ a "knock and talk" procedure the person from whom consent is sought must be informed of that person's right to refuse entry. If the person is not informed of that right, any consent given is vitiated. No "knock and talk" procedure was employed by police officers in this case. They did not go to Petitioner's house to search for contraband

merce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Washington has a similar provision. RCW 9.41.170(1) provides: "It is a class C felony for any person who is not a citizen of the United States to carry or possess any firearm, without first having obtained an alien firearm license from the director of licensing. In order to be eligible for a license, *an alien must provide proof that [the alien] is lawfully present in the United States . . . .*"

without a search warrant. Their presence at the residence was simply in response to a backup request from an INS agent who in good faith believed he had a valid deportation order issued by an immigration judge. This case is thus distinguishable from *Ferrier* and the rule it announced does not apply.

Whether there was valid consent is established under the "totality of circumstances." Petitioner gave consent to the INS agent to enter his residence. The agent was accompanied by local police officers who followed the agent into the house as backup under an established practice. Although Petitioner did not expressly consent to entry by the police officers, he impliedly consented by not objecting to their entry.

In addition, the firearm—the rifle—was observed in plain view before it was seized. Law enforcement officers who observed it knew at the time that Petitioner was not a United States citizen and was a convicted felon who could not lawfully possess a firearm. Petitioner's consent was not vitiated simply because he was not informed of his right to refuse entry.

We affirm the decision of the Court of Appeals affirming the conviction of Petitioner Jorge Luis Bustamante-Davila in the Cowlitz County Superior Court for one count of unlawful possession of a firearm in the second degree.

GUY, C.J., and DURHAM, TALMADGE, and IRELAND, JJ., concur.

ALEXANDER, J. (dissenting) — In my view, the rifle that was seized from Jorge Luis Bustamante-Davila's house by officers of the Cowlitz County sheriff and Longview police should have been suppressed. I reach that conclusion because none of these officers, or the Immigration and Naturalization Service agent who accompanied them, advised Bustamante-Davila that he need not admit them into his home.

A requirement that such advice precede the officers' entry into a home is consistent with the letter and spirit of

our recent ruling in *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998). There we concluded that a warrantless, albeit consensual, search of a home violated the state constitution because the home-dweller was not advised, prior to the search, that she need not consent to having her home searched. The facts of *Ferrier* were that four Bremerton police officers had gone to the home of the defendant, Ferrier, intending to engage in a so-called "knock and talk," a procedure in which an officer or officers go to a suspect's door, knock and make contact with the resident, ask to be admitted, and once inside ask for permission to search. Although the officers were not armed with a search warrant, it was clear that their overriding intent was to obtain Ferrier's consent to search her home. They were not disappointed because once they gained entry to Ferrier's home she consented to their request to permit them to conduct a search. The officers did not, however, advise Ferrier of her right to refuse to consent to the search. Relying on article I, section 7 of the state constitution, we concluded that this procedure was inherently coercive and that because of the heightened expectation of privacy in the home, the search was invalid due to the officers' failure to inform Ferrier that she may lawfully refuse to consent to a search of her home.

While the majority correctly observes that *Ferrier* is distinguishable, in that the plain view seizure of the rifle followed merely from the officers' entry into Bustamante-Davila's home rather than from a consent to search, the core privacy interest that we determined was protected by article I, section 7 of the constitution is identical to that which is at issue here. That interest is the protection of a private dwelling from intrusion without a warrant or compelling need. *Ferrier*, 136 Wn.2d at 114. In further distinguishing *Ferrier*, the majority makes the point that the state officers were merely accompanying an Immigration and Naturalization Service agent who in good faith believed he was executing a valid deportation order. The fact that the federal agent thought he was enforcing a valid deportation order is not, in my view, significant because, as the

State concedes, a deportation order is issued by an administrative law judge and is not equivalent to an arrest or search warrant. The federal and state officers, in short, had no warrant and, as the State conceded at oral argument, Bustamante-Davila could have lawfully refused their request to enter into his home had he been aware of his right to do so.

Moreover, the fact that State officers are in the company of a federal officer does not excuse their noncompliance with State statutes[100] or the state constitution. In an analogous case, the Court of Appeals stated:

> A law enforcement agency . . . cannot avoid the warrant requirement by asking to "tag along" on another agency's warrant for its own purposes. Nor can an agency holding a warrant request unneeded assistance to enable another agency to conduct an otherwise illegal search. RCW 10.93.070 . . . should not be interpreted or used to circumvent the protections of the United States and Washington State Constitutions.

*State v. Bartholomew*, 56 Wn. App. 617, 622, 784 P.2d 1276 (1990). While I am not suggesting that the state officers' participation in the visit to Bustamante-Davila's residence was a mere ruse to gain entry into Bustamante-Davila's home in order to see what was there to be seen, the power of the state officers is no greater than the authority of the federal officer who requested their participation. *See United States v. Medlin*, 842 F.2d 1194, 1196-97 (10th Cir. 1988).

As indicated above, the state and federal officers had no right to search or even enter the house, absent the giving

---

[100]RCW 10.93.070(3) states in pertinent part:

"In addition to any other powers vested by law, a general authority Washington peace officer who possesses a certificate of basic law enforcement training or a certificate of equivalency or has been exempted from the requirement therefor by the Washington state criminal justice training commission may enforce the traffic or criminal laws of this state throughout the territorial bounds of this state, under the following enumerated circumstances:

". . . .

"(3) . . . in response to the request of a peace officer with enforcement authority."

of fully informed consent. The fact that the rifle was seized pursuant to the plain view exception to the warrant requirement avails the officers only if they had a right to be where they were when the contraband was viewed. *See State v. Chrisman*, 100 Wn.2d 814, 819, 676 P.2d 419 (1984). Under the line of reasoning we announced in *Ferrier*, the officers should not have been in Bustamante-Davila's home absent the rendering of advice that he need not admit them. Because they did not precede their entry with such advice, they should not be able to avoid the warrant requirement. The seizure of the rifle was, in my view, unlawful and, therefore, should not have been admitted into evidence. For these reasons, I dissent.

JOHNSON, MADSEN, and SANDERS, JJ., concur with ALEXANDER, J.