FILED
COURT OF APPEALS
DIVISION II

2013 MAY 21 AM 10: 09

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br>　　　　　　　　Respondent,<br><br>v.<br><br>CHRISTINE KAY WESTVANG,<br>　　　　　　　　Appellant. | No. 42777-0-II<br><br>PUBLISHED OPINION |

VAN DEREN, J. — Christine Westvang appeals her conviction on one count of unlawful possession of a controlled substance with intent to deliver. She argues that the trial court should have suppressed the evidence found in her home because officers failed to provide *Ferrier*[1] warnings before obtaining her consent to enter her home to search for an individual with an outstanding arrest warrant. We give meaning to our Supreme Court's discussion in *State v. Williams*[2] and adopt the rule in *State v. Dancer*,[3] which requires that officers give *Ferrier* warnings before obtaining a resident's consent to search a home for a person unless the search is supported by a reasonable suspicion that the person may be found in the home. This result

---

[1] *State v. Ferrier*, 136 Wn.2d 103, 118-19, 960 P.2d 927 (1998) (requiring that before officers seek consent to search a home, the officers must inform the occupant of their right to refuse, limit, or revoke their consent).

[2] *State v. Williams*, 142 Wn.2d 17, 11 P.3d 714 (2000).

[3] *State v. Dancer*, No. 42397-9-II, 2013 WL 1831454, at *5 (Wash. Ct. App. Apr. 30, 2013).

harmonizes our Supreme Court's existing cases dealing with searches for people in a home and those cases dealing with other evidence; thus, we hold that, here, because the officers did not have sufficient corroborating evidence to support a reasonable suspicion that the person for whom they were searching was in Westvang's home, the officers needed to give Westvang *Ferrier* warnings to avoid an arbitrary search for a person. *Williams*, 142 Wn.2d at 27. Because the officers had no independent evidence to corroborate or to support the reliability of an unidentified informant's tip that the individual sought under a search warrant was at Westvang's house and because she was not advised of her right to limit or terminate the officers' search, we reverse the trial court's denial of Westvang's suppression motion and vacate her conviction based on the suppressed evidence.

## FACTS

On March 31, 2011, Detective Kevin Sawyer and Officer Spencer Harris were part of a team conducting a "fugitive sweep" seeking to apprehend Scott Miller, who had an active warrant for his arrest. Report of Proceedings (RP) at 3. They received uncorroborated information that Miller frequented a residence at 1345 Baltimore Street in Longview, Washington, and that he might be located there. That evening, Sawyer and Harris went to the Baltimore Street address, and Harris knocked on the door while Sawyer stood by the corner of the house. Westvang, the owner of the residence, opened the door, and Sawyer joined Harris at the door.

The officers informed Westvang that they were searching for Miller, and she responded that he was not there. The officers again explained that they had information that Miller was at her home. Because the officers noticed that Westvang was nervous and thought that she might be hiding Miller, Sawyer asked if he and Harris could enter her residence to look for Miller.

2

No. 42777-0-II

Sawyer informed Westvang that she did not have to consent to their entry, but neither officer told her that she could end the search at any time or that she could limit the search to particular areas.[4] After telling the officers again that Miller was not there, Westvang agreed to let them enter.

Westvang led the officers through her living room, kitchen, and bedroom, but they did not find Miller. When the officers returned to the living room, Harris noticed a desk large enough that someone could hide behind it and he looked under it.

After determining that no one was hiding under the desk, Harris noticed a digital scale, a white crystal substance, a small metal container that contained numerous plastic bags, a small plastic bag with a green leafy substance, and $105 cash on top of the desk. Upon recognizing the white crystal substance as methamphetamine and the green substance as marijuana, Sawyer read Westvang her *Miranda*[5] rights. Westvang indicated that she understood her rights and told the officers that the methamphetamine belonged to her. The State charged Westvang with one count of unlawful possession of methamphetamine with intent to deliver.[6]

Westvang moved to suppress the methamphetamine and other items seized from her home, arguing that she did not consent to the officers' search. The State argued that because the

---

[4] The trial court's unchallenged findings state that Sawyer informed Westvang that she did not have to consent to the officers' entry, but are silent as to whether either officer informed her that she could limit the scope of their search or that she could withdraw her consent at any time. "In the absence of a finding on a factual issue we must indulge the presumption that the party with the burden of proof failed to sustain their burden on this issue." *State v. Armenta*, 134 Wn.2d 1, 14, 948 P.2d 1280 (1997)).

[5] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L .Ed. 2d 694 (1966).

[6] RCW 69.50.401(1) provides, "[I]t is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance." Methamphetamine is a controlled substance. RCW 69.50.101(d); RCW 69.50.206(d)(2).

3

officers did not seek to enter Westvang's home to search for contraband or evidence of a crime, but, rather, they sought to enter for a legitimate investigative purpose—to arrest Miller on a valid warrant—they were not required to advise her of her right to refuse, revoke, or limit her consent to the search.

The trial court denied Westvang's motion to suppress the evidence, concluding that "[t]he officers were at [Westvang's] residence for a legitimate investigatory purpose" and that Westvang gave valid consent for the officers to enter her residence. Clerks Papers (CP) at 67. A jury found Westvang guilty of unlawful possession of methamphetamine with intent to deliver, and the trial court imposed a standard-range sentence of 12 months and one day.

Westvang appeals.

## ANALYSIS

Westvang argues that the trial court erred when it denied her motion to suppress the evidence found in her home because the officers sought to arbitrarily search her home for a guest and, thus, the officers were required to provide her *Ferrier* warnings before obtaining her consent to search. The State responds that under our Supreme Court's limitations to the *Ferrier* rule, the officers were not required to provide *Ferrier* warnings because they did not seek consent to search her house for contraband or evidence of a crime; rather, they had a legitimate investigatory purpose—to search for Miller. We clarify that officers are required to provide *Ferrier* warnings before obtaining consent to search a home for a person when, as here, the officers had no reasonable suspicion that the person could be found in the defendant's home.

I.      STANDARD OF REVIEW

Because Westvang does not challenge any of the trial court's findings of fact, they are verities on appeal. *State v. Bustamante-Davila*, 138 Wn.2d 964, 976, 983 P.2d 590 (1999). We

4

review de novo the trial court's conclusion that the warrantless search of Westvang's home was valid. *State v. Moore*, 161 Wn.2d 880, 885, 169 P.3d 469 (2007).

II.     The *FERRIER* WARNING REQUIREMENT AND ITS LIMITATIONS

The Fourth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, prohibits unreasonable searches and seizures. *State v. Setterstrom*, 163 Wn.2d 621, 625-26, 183 P.3d 1075 (2008). The Washington State Constitution provides greater protection, and "[u]nder article I, section 7, warrantless searches are per se unreasonable." *State v. Kull*, 155 Wn.2d 80, 85, 118 P.3d 307 (2005).

Article I, section 7 of the Washington State Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Under the Washington State Constitution, "the home receives heightened constitutional protection." *Kull*, 155 Wn.2d at 84. "The heightened protection afforded state citizens against unlawful intrusion into private dwellings places an onerous burden upon the government to show a compelling need to act outside of our warrant requirement." *State v. Chrisman*, 100 Wn.2d 814, 822, 676 P.2d 419 (1984).

Exceptions to the warrant requirement are "'jealously and carefully drawn.'" *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004) (internal quotations marks omitted) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)). Thus, the State bears the burden of proving an exception to the warrant requirement. *Ferrier*, 136 Wn.2d at 111. If the State fails to meet its burden that an exception to the warrant requirement applies, "all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed." *State v. Ladson*, 138 Wn.2d 343, 359, 979 P.2d 833 (1999).

Officers may conduct a warrantless search of a home if they obtain the resident's consent. *Ferrier*, 136 Wn.2d at 111. Under certain circumstances, when officers conduct what our Supreme Court has characterized as a "knock and talk,"[7] police officers must give particular warnings before valid consent can be obtained

> when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.

*Ferrier*, 136 Wn.2d at 118-19.

In *Ferrier*, Ferrier's son informed police officers that Ferrier was growing marijuana in her home. 136 Wn.2d at 106. Because seeking a search warrant would have required disclosing the son's identity, the officers decided to perform a knock and talk instead. *Ferrier*, 136 Wn.2d at 107. After the officers knocked on Ferrier's door and identified themselves, Ferrier invited them into her home. *Ferrier*, 136 Wn.2d at 107. The officers informed her that they believed that a marijuana grow operation was being conducted in her house and that they wanted to search her home and seize the marijuana. *Ferrier*, 136 Wn.2d at 108. Ferrier signed a "consent to search" form that did not indicate that she had the right to refuse consent to the search and the officers did not inform her of that right. *Ferrier*, 136 Wn.2d at 108. She then led the officers upstairs to a room containing marijuana plants. *Ferrier*, 136 Wn.2d at 108-09. The officers

---

[7] In a "knock and talk," a law enforcement officer knocks on the door of a residence, makes contact with the resident, and asks permission to enter the residence to discuss the officer's investigation. *Ferrier*, 136 Wn.2d at 107. Once inside the residence, the officer informs the resident why the officer is there and asks permission to search the premises. *Ferrier*, 136 Wn.2d at 107.

seized the plants and Ferrier was convicted of manufacturing a controlled substance after the trial court denied her suppression motion. *Ferrier*, 136 Wn.2d at 109.

Our Supreme Court reversed the denial of her suppression motion, holding that Ferrier's consent was "vitiate[d]" by the officers' failure to inform her of her right to refuse, limit, or revoke her consent. *Ferrier*, 136 Wn.2d at 118-19. The court reasoned that the warnings were required because "any knock and talk is inherently coercive to some degree" because

> the great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search.

*Ferrier*, 136 Wn.2d at 115.

After *Ferrier*, our Supreme Court's decisions have been read to curtail its application in all but formal "knock and talk" situations. Our Supreme Court has made it clear that *Ferrier* warnings are not required every time an officer seeks to enter an individual's home. *Khounvichai*, 149 Wn.2d at 566. Noting that "police often enter homes for investigative purposes, such as inspecting break-ins, vandalism, and other routine responses," our Supreme Court has held that *Ferrier* warnings are required only where "police seek entry to a home to conduct a warrantless search for contraband or evidence of a crime" and not when they request "consent to enter a home for other legitimate investigatory purposes." *Khounvichai*, 149 Wn.2d at 563, 566, 564; *see also Williams*, 142 Wn.2d at 27-28; *Bustamante-Davila*, 138 Wn.2d at 980.

In *Bustamante-Davila*, a United States Immigration and Naturalization Service (INS) agent, accompanied by four police officers, went to Bustamante-Davila's home to arrest him on a presumptively valid deportation order. 138 Wn.2d at 967-68. When Bustamante-Davila opened

his door in response to the INS agent's knock, the INS agent asked if he could enter. *Bustamante-Davila*, 138 Wn.2d at 968-69. Bustamante-Davila did not object, and after the officers and the INS agent entered the home, the INS agent told Bustamante-Davila that he was under arrest for an immigration violation and told him to gather his belongings because he would not be returning to his home. *Bustamante-Davila*, 138 Wn.2d at 969. The INS agent followed Bustamante-Davila to the back of his home and one of the officers observed an illegally possessed rifle standing against the living room wall in plain view. *Bustamante-Davila*, 138 Wn.2d at 969. The officer knew that Bustamante-Davila was a convicted felon and seized the firearm. *Bustamante-Davila*, 138 Wn.2d at 970.

Our Supreme Court affirmed the trial court's denial of Bustamante-Davila's suppression motion, holding that "the police officers did not employ a 'knock and talk' procedure in this case"; thus, no *Ferrier* warnings were required. *Bustamante-Davila*, 138 Wn.2d at 981, 984. Our Supreme Court distinguished the case from *Ferrier*, noting that

> [t]he police officers in this case did not proceed to [Bustamante-Davila]'s residence with the intent to find contraband without obtaining a search warrant. They merely accompanied the INS agent as backup, a standard practice in INS arrest and deportation matters. [Bustamante-Davila] did not consent to a search, but consented to entry into his home.

*Bustamante-Davila*, 138 Wn.2d at 980.

In *Williams*, a citizen informed a police officer that Williams had a warrant out for his arrest and that he could be found at a local apartment. 142 Wn.2d at 19. The citizen also provided the officer with a description of Williams's clothing and vehicle. *Williams*, 142 Wn.2d at 19. After confirming that Williams had an outstanding arrest warrant, the officer drove to the apartment and observed his vehicle in the parking lot. *Williams*, 142 Wn.2d at 19. The officer called for backup and, after another officer arrived, the two officers approached the open door of

the residence and called for Williams. *Williams*, 142 Wn.2d at 19-20. When the person who rented the apartment appeared at the door, one of the officers informed that person that the officers were looking for Williams and that he had a warrant for Williams's arrest. *Williams*, 142 Wn.2d at 20. The renter told the officer that he did not know Williams but that there was a guest in his home that he knew by another name. *Williams*, 142 Wn.2d at 27. The officer requested the renter's consent to enter the apartment to identify the guest. *Williams*, 142 Wn.2d at 27. The renter agreed, and when the officers entered the apartment, they immediately identified Williams and arrested him. *Williams*, 142 Wn.2d at 20. The officers discovered heroin in Williams's pocket in a search incident to his arrest. *Williams*, 142 Wn.2d at 20.

Our Supreme Court affirmed the trial court's denial of Williams's suppression motion, noting that *Bustamante-Davila* "limited *Ferrier* to the kind of coercive searches the police employed there [and] rejected the contention that *Ferrier* was a 'bright-line' rule required in every case where police obtain search authority by consent." *Williams*, 142 Wn.2d at 26. The Court observed that "[p]olice officers are oftentimes invited into homes for investigative purposes, including inspection of break-ins, vandalism, and other routine responses" and, thus, "[t]o apply the *Ferrier* rule in these situations would unnecessarily hamper a police officer's ability to investigate complaints and assist the citizenry." *Williams*, 142 Wn.2d at 27-28. The court limited the necessity of *Ferrier* warnings "to situations where police seek to conduct a search for contraband or evidence of a crime without obtaining a search warrant." *Williams*, 142 Wn.2d at 27-28.

> Thus, the *Williams* court explained that *Ferrier* warnings were not required because
>
> *the police officers did not seek to enter [the] apartment to look for contraband or to arbitrarily search a home for a hidden guest.* The officers in this case first verified the accuracy of an informant's statement and identified the defendant's

vehicle in front of [the] apartment, which allowed the officers to reasonably conclude that Williams was inside. Subsequently, when the officers spoke with [the renter], the officers did not request permission to search the premises but asked only whether the defendant was inside. [The renter] told the officers that there was a guest in his home and that he knew the guest by another name. He agreed to allow the police officers to come inside and confirm the identities of the persons inside. Considering the limited purpose of the police entry and that [the renter] acknowledged that he had guests inside, this case does not resemble a "knock and talk" warrantless search that *Ferrier* intended to prevent.

*Williams*, 142 Wn.2d at 27 (emphasis added).

Finally, in *State v. Khounvichai*, two officers responded to a report of malicious mischief at an address the complainant provided. 149 Wn.2d 557, 559, 69 P.3d 862 (2003). When a woman answered the officers' knock, they asked her whether the suspect was home. *Khounvichai*, 149 Wn.2d at 559. The woman told the officers that the suspect was her grandson and that he was at home, and the officers asked if they could enter to talk to him. *Khounvichai*, 149 Wn.2d at 559. She allowed the officers into her home and one officer followed her to a room that smelled of marijuana. *Khounvichai*, 149 Wn.2d at 559-60. The suspect stepped out of the room and, when he saw the officer, turned and whispered to two other individuals in the room. *Khounvichai*, 149 Wn.2d at 560. One of those individuals, Khounvichai, quickly moved across the room and out of the officer's sight. *Khounvichai*, 149 Wn.2d at 560. Concerned that Kounvichai was reaching for a weapon, the officer grabbed him and a baggie of cocaine fell out of his hand. *Khounvichai*, 149 Wn.2d at 560.

Our Supreme Court affirmed the trial court's denial of Khounvichai's suppression motion, reiterating its holding in *Williams* that "[t]he *Ferrier* rule applies [only] to situations where police seek entry to a home to conduct a warrantless search for contraband or evidence of a crime" and not when police seek consent to enter "for other legitimate investigatory purposes." *Khounvichai*, 149 Wn.2d at 566, 564. Because the police in *Khounvichai* sought to enter the

No. 42777-0-II

home to question a suspect in a malicious mischief complaint and not to conduct a warrantless search, our Supreme Court held that *Ferrier* warnings were not required. 149 Wn.2d at 566-67. In reaffirming its distinction between warrantless searches and other investigatory purposes, our Supreme Court noted, "When police obtain consent to search a home pursuant to a 'knock and talk' they go through private belongings and affairs without restriction. Such an intrusion into privacy is not present, however, when the police seek consensual entry to question a *resident*." *Khounvichai*, 149 Wn.2d at 564 (emphasis added).

## III. WARRANTLESS SEARCH

Westvang argues that the evidence seized from her home should be suppressed because the officers failed to provide her *Ferrier* warnings before they obtained her consent to search her home for Miller when they did not have corroborating evidence that Miller could be found in the home. The State responds that the officers sought to enter Westvang's home for a legitimate investigatory purpose—searching for Miller—and, thus, were not required to provide *Ferrier* warnings to Westvang because they were not searching for contraband or evidence of a crime. We agree with Westvang.

Westvang contends that the trial court erred in denying her motion to suppress the evidence because it improperly distinguished between a search for a person and a search for other evidence.[8] When it denied Westvang's suppression motion, the trial court concluded, "The

---

[8] *See Williams*, 142 Wn.2d at 33, n. 8 (Sanders, J., dissenting) ("'[T]he plain wording of the Fourth Amendment admits of no exemption from the warrant requirement when the search of a home is for a person rather than for a thing.'" (alteration in original) (quoting *Steagald v. U.S.*, 451 U.S. 204, 214 n.7, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981))); *Khounvichai*, 149 Wn.2d at 571 (Sanders, J., dissenting) ("[T]he 'officers' request for permission to enter is, in effect, a request for permission to search for anything in plain view,' and I can think of no reason why the home dweller should not be informed of his right to refuse consent to entry." (internal quotation marks omitted) (quoting *State v. Kennedy*, 107 Wn. App. 972, 977, 29 P.3d 746 (2001))).

11

officers were at [Westvang]'s residence for a legitimate investigatory purpose. They were not there searching for drugs; rather, they were searching for . . . Miller, who had an active [Department of Corrections] warrant." CP at 67.

But notwithstanding our Supreme Court's distinction between an officer's obtaining consent to enter a home for a "legitimate investigatory purpose" and to search for contraband or evidence of a crime, the facts in Westvang are distinguishable from those in our Supreme Court's decisions limiting *Ferrier* and are more comparable to the arbitrary search for a hidden guest considered in *Williams*. In situations like those in *Bustamante-Davila*, *Williams*, and *Khounvichai*, in which officers sought consent to enter an individual's home to search for a person, an officer's failure to provide *Ferrier* warnings did not render consent invalid because the officers had independent corroborating evidence that the person could actually be found in the home. *Williams*, 142 Wn.2d at 27. In all three cases, the officers had more than a mere informant's tip that the person they sought might be found within the residence.

In *Bustamante-Davila*, the officers contacted the defendant in his own home. 138 Wn.2d at 967. In *Williams*, the officers not only had an informant's tip that an individual with a warrant out for his arrest could be found within the apartment, but the officers also identified the individual's vehicle outside the residence and the renter indicated that he had guests and that it was possible that the individual could be inside. 142 Wn.2d at 19. And in *Khounvichai*, the resident was the suspect's grandmother and she confirmed that the suspect was in her home. 149 Wn.2d at 559. Thus, in *Bustamante-Davila*, *Williams*, and *Khounvichai*, the officers seeking entry to a home to determine whether a particular person was inside had corroboration that the person sought was at the home, consistent with our Supreme Court's characterization of the

activity not as a search, but rather as an investigation, thus moving the activity outside the scope of *Ferrier*.

Here, although the officers sought Westvang's consent to enter her home to search for Miller, not to search for methamphetamine or other evidence of a crime, they had no reasonable suspicion, other than an uncorroborated informant's tip for whom the record shows no prior officer experience regarding the reliability of the informant, that Miller was in any way connected with Westvang's home.[9] Unlike in *Bustamante-Davila*, *Williams*, or *Khounvichai*, Westvang told the officers that Miller was not in her home. And unlike in *Bustamante-Davila* or *Khounvichai*, the officers were not looking for Miller at his own home or that of a family member; rather, they searched for him in Westvang's home. Thus, the facts here fall within the scope of police conduct for which *Williams* impliedly requires *Ferrier* warnings because the officers' entry without warnings allowed them to search arbitrarily for a hidden guest.

We give meaning to *Williams*'s "arbitrary search" discussion and clarify that the spreading belief that *Ferrier* warnings are required only when officers seek to enter a home to search for contraband or evidence of a crime and not for a person is incorrect. Such a rule would allow searches of homes contrary to the Fourth Amendment and article 1, section 7 of our state constitution, giving officers unfettered discretion to seek unadvised consent to enter a home to search for a person without a reasonable suspicion that the person sought could be found in the home. This holding is consistent with our recent decision in *Dancer*, 2013 WL 1831454, at *5,

---

[9] Both officers testified about the informant at the suppression hearing but they provided no information supporting the informant's reliability. Harris stated that he received information that Miller could be found at Westvang's residence "from a subject we contacted prior to going to the Baltimore Street address." RP at 3. Harris said that the subject led him to believe that Miller could be found there because "[h]e was known to frequent that residence." RP at 4. Sawyer testified that someone "in the trailer park had stated that . . . Miller frequents the 1345 Baltimore, #1, address." RP at 16.

in which we held that when seeking consent to enter a home to search for a person, the officers must have a reasonable suspicion that the person can actually be found in the home.

In *Dancer*, a woman reported that her boyfriend, Sean Johnson, had assaulted her, and that the couple's children could be found either at the couple's shared residence or at the home of their next door neighbor, Dancer. 2013 WL 1831454, at *1. The police used a canine unit to track Johnson, and the dogs led the police to Dancer's house. *Dancer*, 2013 WL 1831454, at *1. Dancer answered her door and confirmed that the children were in her home but denied Johnson's presence, telling police that she had seen him leave and showing them the direction he went. *Dancer*, 2013 WL 1831454, at *1. The officer asked Dancer if he could enter her home to search for Johnson but did not provide *Ferrier* warnings. *Dancer*, 2013 WL 1831454, at *1. Dancer consented to the officers' entry and they discovered methamphetamine in plain view after Dancer agreed to open a locked bedroom door at the officer's request. *Dancer*, 2013 WL 1831454, at *1.

We affirmed the trial court's denial of Dancer's suppression motion, holding that "where police obtain consent to enter and search a home for a person after informing the home's occupant of the purpose of the search and where the search is supported by a reasonable suspicion that the person may be found in the home, the police need not advise the occupant that she may refuse or limit entry or the subsequent search." *Dancer*, 2013 WL 1831454, at *5. We agree with *Dancer's* holding and apply it here.

Here, as in *Dancer*, the officers informed Westvang that their purpose was to search her home for a person, Miller. But unlike in *Dancer*, the officers here had no reasonable suspicion that Miller could be found in Westvang's home. Although both Dancer and Westvang denied that the subject of the search was present, the officers in *Dancer* had a tip that Johnson could be

14

found in Dancer's house and that information was corroborated by the dogs leading the police to Dancer's door. 2013 WL 1831454, at 1. Here, in contrast, there was no independent evidence to corroborate the informant's tip; nor does the record reflect that the officers had prior experience with this informant such that they could reasonably rely on the accuracy of this tip. Thus, under the rule set forth in *Dancer* and supported by our Supreme Court's discussion in *Williams*, the officers here improperly failed to give *Ferrier* warnings to Westvang because they did not have a reasonable suspicion that Miller could be found in her home, thus conducting an unlawful arbitrary search for a hidden guest.

Westvang also contends that her case is comparable to *State v. Freepons*, 147 Wn. App. 689, 694, 197 P.3d 682 (2008), in which Division Three of this court held that officers failed to obtain valid consent to search a home for a suspect when they failed to provide *Ferrier* warnings. In *Freepons*, officers investigated a one-car accident in which the driver had abandoned his vehicle at the accident scene. 147 Wn. App. at 691. The vehicle's 19-year-old owner, Adam Byrne, told the officers that he had been drinking at a party the night before and that he had last seen his car parked at the house where the party took place. *Freepons*, 147 Wn. App. at 691. He also informed the officers that his brother, Bryan Byrne, who was also at the party, might have taken the car. *Freepons*, 147 Wn. App. at 691.

At the party's location, officers observed empty beer cans in the yard and concluded that there had been underage drinking on the premises. *Freepons*, 147 Wn. App. at 691-92. Freepons and another individual opened the door, and the officers told them that they were investigating a car accident and were looking for Bryan. *Freepons*, 147 Wn. App. at 692. The residents responded that the Byrne brothers had been at the house the night before but that they were no longer there. *Freepons*, 147 Wn. App. at 692. The residents nevertheless allowed the

15

officers to enter the home to look for Bryan, and the officers discovered marijuana plants in the home. *Freepons*, 147 Wn. App. at 692.

Division Three held that the trial court should have suppressed the evidence, noting that although "the deputies were interested in finding Bryan . . . the State did not show and the court did not find that the desire to find [Bryan] was motivated by anything other than to look for evidence of a crime associated with the rollover accident." *Freepons*, 147 Wn. App. at 694. Thus, it held that *Ferrier* warnings were required because the officers were searching for evidence of crimes related to the car accident when they asked for consent to enter the home to look for the vehicle owner's brother. *Freepons*, 147 Wn. App. at 694. This outcome is consistent with *Williams*. The officers had no evidence that Bryan was at the house searched, other than Adam's statement that Bryan had been there the night before. Thus, Westvang's reliance on *Freepons* is well taken, although the case was ultimately decided under a different analysis of when *Ferrier* applies.

We reject the State's argument that officers need never give *Ferrier* warnings when requesting consent to enter a home to search for a person, as such a rule is not consistent with the constitutional protections against unwarranted searches of a home. To harmonize the existing cases dealing with searches for people in a home and those dealing with other evidence, we hold that here, without any corroborating or reliable evidence that Miller was in Westvang's home, the officers lacked a reasonable suspicion that Miller could be found in Westvang's home and, thus, the officers needed to give Westvang *Ferrier* warnings to avoid an arbitrary search for a hidden person. *See Williams*, 142 Wn.2d at 27. Our holding is consistent with *Dancer* and explains the results in *Ferrier*, *Bustamante-Davila*, *Williams*, and *Khounvichai*, i.e., in each instance the officers had a reasonable suspicion that the person for whom they were searching

16

was at the home where they requested entry. This rule also enforces *Williams*'s proscription against arbitrary searches for a person without *Ferrier* warnings.[10]

Because the circumstances here fall within the discussion in *Williams*, 142 Wn.2d at 27, requiring *Ferrier* warnings where officers "arbitrarily search a home for a hidden guest," and are consistent with the rule in *Dancer*, we reverse the trial court's denial of Westvang's suppression motion, suppress the methamphetamine evidence, vacate the unlawful possession of methamphetamine conviction, and remand.

_____
VAN DEREN, J.

We concur:

_____
PENOYAR, J.

_____
WORSWICK, C.J.

---

[10] Westvang also argues that if the State raises a claim that she failed to preserve her *Ferrier*-based objection for appeal, then her counsel was ineffective for failing to raise it at the trial court in his motion to suppress the evidence. But the State does not contend that Westvang failed to preserve the issue and even though her counsel did not raise *Ferrier* at the suppression hearing, the State argued at the suppression hearing that the officers were not required to provide *Ferrier* warnings because they were there for a legitimate investigatory purpose, not searching for contraband or evidence of a crime, and the trial court agreed with the State. Because we hold that the *Ferrier* warnings were required, we do not address Westvang's ineffective assistance of counsel claim.