251 P.3d 929 (2011)
STATE of Washington, Respondent,
v.
Dara RUEM, Appellant.
Nos. 39053-1-II, 39451-1-II.
Court of Appeals of Washington, Division 2.
June 1, 2011.
*931 Lance M. Hester, Attorney at Law, Casey Matthew Arbenz, The Hester Law Group Inc. PS, Tacoma, WA, for Appellant.
Stephen D. Trinen, Pierce County Prosecutor's Ofc., Tacoma, WA, for Respondent.
PENOYAR, C.J.
¶ 1 Dara Ruem appeals his convictions of unlawful manufacture of marijuana (count I), unlawful possession of marijuana with intent to deliver (count II), first degree unlawful possession of a firearm (count III), and his firearm enhancements on counts I and II. Ruem argues that (1) police officers lacked legal authority to enter his residence, where they discovered incriminating evidence; and (2) the State presented insufficient evidence to support the firearm enhancements. In a statement of additional grounds,[1] Ruem contends that police unlawfully seized him when they ran a warrants check on him before entering his residence. We affirm Ruem's convictions, affirm the firearm enhancement on count II, reverse the firearm enhancement on count I, and remand for resentencing.

*932 FACTS[2]
¶ 2 On February 11, 2008, Pierce County Superior Court issued a felony arrest warrant for Chantha Ruem, who is Ruem's older brother. The arrest warrant listed a Tacoma address on McKinley Avenue as Chantha's[3] residence. The McKinley Avenue property contains a house and a single-wide mobile home.
¶ 3 On June 4, 2008, police officers went to the McKinley Avenue property to serve the arrest warrant on Chantha. Chantha's white car was parked near the mobile home. Deputy Kevin Fries and Sergeant Tom Seymour knocked on the mobile home's door. Ruem opened the door and spoke with Fries and Seymour while standing in the doorway. Fries told Ruem that they were looking for Chantha, and Ruem replied that Chantha was not there. Because Fries thought that Ruem looked like Chantha based on photographs of Chantha that he had seen, Fries asked Ruem for identification, which Ruem provided.
¶ 4 At the suppression hearing, Fries testified about what happened next:
Q: What happened after that?
A: I asked him who all lived there. And he said he lives there with his brother.
Q: Did you ask him his relation to Chantha Ruem?
A: I assumed it was his brother.
Q: Okay. Do you recall ever confirming with the defendant?
A: You know, I honestly don't remember if I got that detail ... I assumed they were brothers. They look close. His last name was the same. And then, when we were talking about it, he knows that I'm there looking for Chantha. He says he lives there with his brother. He says he's not there. I assumed we were talking about the same person, a brother.
Q: Okay. So, he saidBut he said that he does live in that mobile with his brother?
A: Yes.
Q: Okay. Who
A: Who I assumed was Chantha.
Q: Okay. What happened after that?
A: I asked him if Chantha Ruem was inside. He said no, that he had moved to California. I asked him if Chantha's car was there, and he said yes, and he pointed to a white Toyota that was parked right in front of the mobile home.
So I asked him why would his car be here if he's moved to California, and he told me that he had gotten a new car.
....
Q: [W]hat happened after that?
A: I was running him on records to see if he had any warrants; told him we were going to go inside and check. I said we'd like to go inside and check. Certainly, would like cooperation more so than force, although the warrant has that address on it, the fact that we're talking, he is referring to his brother living there with him, his car is out front, it'sit gives me reason to believe that he is there. So I told him I was going to go in and look for him, and asked him if that was okay. And he initially agreed to that but, as we started to step in, he stopped and said, "Well, now is not a good time." But, we had *933 already started to step over the threshold, and I could smell some marijuana in the air. And I turned around to him and I says, "What's your concern?" He said, "Marijuana." I said, "Are you smoking it? Are you growing it? What are you doing?" He says, "I'm""Is it just personal use?" I said, "I'm not here for personal use. If you've got a bong or something laying out," I said, "I'm not concerned about that. We're looking for your brother, looking for Chantha."
Q: Okay.
A: So we entered to search the residence.
Report of Proceedings (RP) (Dec. 10, 2008) at 31-34.
¶ 5 At the suppression hearing, Seymour described the same exchange with Ruem as follows:
[W]e asked him if we could enter the residence to search for Chantha. I don't recall exactly the verbiage or how it went, but at some point in time he said we could go in, and then he said, "This is not a good time." At that point in time, we actually smelled ... burnt marijuana.... Because he was not the focus of our target, and because it was his residence, we honestly were not going to pursue or arrest him for smoking marijuana at that time. That was our intent. But, we assumed that what he was doing was not letting us in because he had been smoking marijuana. We expected to go in and perhaps find a bong or something on the couch or on the table, but that's not what we're interested in. So we were actually convincing him that, no, we are going to go in, we are not going to take you for smoking marijuana. And so we were telling him at that point in time that we were going to go ahead and go in and search.
RP (Dec. 10, 2008) at 49-50.
¶ 6 At the suppression hearing, Ruem testified that he told officers that he lived with his brother David, not Chantha, in the mobile home, and that Chantha had lived in the main house but had since moved to California. Ruem testified that he did not consent to the officers' entry. The trial court entered a written finding that Ruem's testimony at the suppression hearing was not credible.
¶ 7 Fries and another deputy entered the mobile home while Seymour remained with Ruem in the living room. The deputies observed several marijuana starter plants[4] in plain view in the kitchen. The deputies informed Seymour, who "took a look" and then handcuffed and arrested Ruem. RP (Dec. 10, 2008) at 55.
¶ 8 Once officers determined that Chantha was not present, Seymour called the Special Investigations Unit (SIU) for assistance in obtaining a search warrant for the mobile home. The SIU detective asked Seymour if the mobile home had any distinguishing marks to include in the search warrant affidavit. As Seymour walked around the exterior of mobile home looking for distinguishing marks, he discovered two flats of marijuana starter plants next to the mobile home's rear exterior wall.
¶ 9 A magistrate issued a search warrant for the mobile home. In the north bedroom, police discovered a "grow room" with dozens of marijuana plants under a 1000-watt bulb, a thermometer, a timer, and other cultivation materials. Police found Ruem's driver's license and other documents with Ruem's name in the north bedroom.
¶ 10 In the closet of the south bedroom, police discovered marijuana, two bulletproof vests, and a locked combination safe on the floor. Police opened the safe with a hydraulic tool and found $2,760 in cash, two gallonsize plastic bags with marijuana, and a .45 caliber semi-automatic pistol with a loaded magazine. The pistol was operable and could have been fired after the operator chambered a bullet, a task that requires about one second. The safe also held four credit cards, banking documents, and a casino card, all in the name of Ruem's brother, David.
¶ 11 Ultimately, police confiscated about six pounds of marijuana from the mobile home. Police found five .45 caliber bullets, an empty handgun holster, and "a metal ammunition magazine" in the living room, *934 eight .45 caliber bullets in a kitchen drawer, and an ammunition box with several expended cartridges in the laundry room. 2 RP at 166. Police also seized other drug paraphernalia distributed throughout the house, including a grinder, strainer, and cooking pot with green residue, scales, and a hydroponic grow mat.
¶ 12 The State charged Ruem with the unlawful manufacture of marijuana (count I),[5] the unlawful possession of marijuana with intent to deliver (count II),[6] and first degree unlawful possession of a firearm (count III).[7] The State sought enhanced sentences, alleging, in relevant part, that Ruem committed counts I and II while armed with the .45 caliber pistol.[8] The trial court denied Ruem's motion to suppress, which argued that police did not have probable cause to believe that Chantha was actually present at the time of police entry.
¶ 13 The jury convicted Ruem as charged and returned a special verdict supporting the firearm enhancements. Ruem appeals his convictions and sentence.

ANALYSIS

I. RUEM'S CONSENT AS BASIS FOR POLICE ENTRY
¶ 14 Ruem asserts that his consent did not justify police entry into his home because police did not advise him of his right to refuse consent under State v. Ferrier, 136 Wash.2d 103, 960 P.2d 927 (1998). In the alternative, he argues that even if Ferrier does not apply, his consent was "mere acquiescence to authority." Appellant's Br. at 26. We disagree.[9]
¶ 15 "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7. "[A] citizen's privacy is most protected in his or her home." State v. Hatchie, 161 Wash.2d 390, 397, 166 P.3d 698 (2007). A warrantless search is per se unreasonable under article I, section 7 "unless excused under one of a narrow set of exceptions to the warrant requirement." State v. Tibbles, 169 Wash.2d 364, 368-69, 236 P.3d 885 (2010). The State has the burden to demonstrate that an exception applies. Tibbles, 169 Wash.2d at 369, 236 P.3d 885. We review a trial court's conclusions of law pertaining to the suppression of evidence de novo. State v. Fry, 168 Wash.2d 1, 5, 228 P.3d 1 (2010).
¶ 16 The officers in this case saw marijuana plants in plain view in Ruem's kitchen after entering his home. Plain view is an exception to the warrant requirement. Hatchie, 161 Wash.2d at 395, 166 P.3d 698. A plain view search is legal when police (1) have a valid justification to be in an otherwise protected area and (2) are immediately able to realize that the evidence they see is associated with criminal activity. Hatchie, 161 Wash.2d at 395, 166 P.3d 698.
¶ 17 In order to determine whether the officers' plain view search was lawful, we must analyze whether Ruem consented to their entry, thereby giving the officers a valid justification to be in Ruem's kitchen. We determine whether an individual's consent to police entry into the individual's home was voluntary by analyzing the "totality of the circumstances," including the consenting person's education and intelligence, whether police provided Miranda[10] warnings prior to consent, if applicable, and whether police advised the consenting person of his right not to consent. State v. Bustamante-Davila, 138 Wash.2d 964, 981-82, 983 P.2d 590 (1999). No single factor is dispositive. Bustamante-Davila, 138 Wash.2d at 982, 983 P.2d 590.
*935 ¶ 18 Consent granted "only in submission to a claim of lawful authority is not given voluntarily." State v. O'Neill, 148 Wash.2d 564, 589, 62 P.3d 489 (2003) (internal quotation marks omitted) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Thus, as the U.S. Supreme Court has explained in the Fourth Amendment context, "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercionalbeit colorably lawful coercion. Where there is coercion there cannot be consent." Bumper v. North Carolina, 391 U.S. 543, 550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).
¶ 19 Ruem argues that because police employed a "knock and talk" procedure, they were required to inform him of his right to refuse consent. Appellant's Br. at 24-25. In Ferrier, the court held that because a "knock and talk" is inherently coercive, the police's failure to advise a defendant of the right to refuse entry vitiates the defendant's consent. 136 Wash.2d at 114, 960 P.2d 927. Our Supreme Court later clarified that a "knock and talk" occurs when police "proceed to [a] residence with the intent to find contraband without obtaining a search warrant." Bustamante-Davila, 138 Wash.2d at 980, 983 P.2d 590; accord State v. Thang, 145 Wash.2d 630, 637, 41 P.3d 1159 (2002) (concluding that defendant's reliance on Ferrier was "misplaced" where police entered third party's home based on defendant's arrest warrant). Here, because officers knocked on Ruem's door to serve an arrest warrant on Chanthanot to seek contraband without a warrantFerrier does not apply.
¶ 20 We believe that the totality of the circumstances demonstrates that the State met its burden to prove the voluntariness of Ruem's consent. Significantly, both Fries and Seymour testified that they asked for Ruem's permission to enter and that Ruem allowed them to enter. The trial court did not believe Ruem's assertions to the contrary and found that he was not credible. As we have noted, the deputies did not inform Ruem that he could refuse consent, but Ruem's belated statement that it was "not a good time" for police to enter suggests that Ruem knew that he could freely give and withhold consent.[11] RP (Dec. 10, 2008) at 33, 49. Finally, although Fries testified that he informed Ruem that police were going to "go inside and check" for Chantha, neither Fries nor Seymour told Ruem that police had legal authority to enter Ruem's residence on the basis of the arrest warrant regardless of Ruem's wishes. RP (Dec. 10, 2008) at 33; see Bumper, 391 U.S. at 550, 88 S.Ct. 1788; O'Neill, 148 Wash.2d at 589, 62 P.3d 489. On this record, we think that Ruem's consent was voluntary.
¶ 21 After Ruem consented to entry, the officers were legally entitled to be in his residence where they observed marijuana plants. Fries associated these plants with criminal activity based on his previous law enforcement training. Therefore, because the State can demonstrate that both prongs of the plain view exception apply here, the trial court properly admitted evidence of the marijuana plants that police observed in plain view in the kitchen while looking for Chantha. Furthermore, because this plain view observation also served as probable cause for the subsequent search warrant, the trial court also properly admitted evidence that police discovered while executing the search warrant.[12]

II. FIREARM ENHANCEMENTS
¶ 22 Ruem next argues that insufficient evidence supports the jury's special verdicts that he was armed with a firearm during the commission of counts I and II. We agree that insufficient evidence supports the firearm enhancement on count I, but we *936 conclude that sufficient evidence supports the firearm enhancement on count II.
¶ 23 We review a jury's special verdict that a defendant was armed to determine whether there was sufficient evidence for any rational trier of fact to find beyond a reasonable doubt that the defendant was armed. State v. Eckenrode, 159 Wash.2d 488, 494, 150 P.3d 1116 (2007). A sufficiency challenge admits the truth of the State's evidence and accepts all reasonable inferences that may be made from this evidence. Eckenrode, 159 Wash.2d at 496, 150 P.3d 1116.
¶ 24 A court must add time to a defendant's sentence for certain felonies if the jury enters a special verdict that the defendant was armed with a firearm while committing the crime. RCW 9.94A.533(3),.825.[13] A person is "armed" if "a weapon is easily accessible and readily available for use, either for offensive or defensive purposes." Eckenrode, 159 Wash.2d at 493, 150 P.3d 1116 (quoting State v. Valdobinos, 122 Wash.2d 270, 282, 858 P.2d 199 (1993)). Additionally, in a constructive possession case like this one, there must be "a nexus between the weapon and the defendant and between the weapon and the crime." State v. Schelin, 147 Wash.2d 562, 567-68, 55 P.3d 632 (2002) (plurality opinion); Schelin, 147 Wash.2d at 576-77, 55 P.3d 632 (Alexander, C.J., concurring); accord State v. Gurske, 155 Wash.2d 134, 138, 141, 118 P.3d 333 (2005). Whether a defendant is "armed" presents "a particularly difficult question when the defendant had only constructive possession over a weapon." State v. Easterlin, 159 Wash.2d 203, 206, 149 P.3d 366 (2006).
¶ 25 The "easily accessible and readily available" requirement means that "mere constructive possession is insufficient to prove a defendant is `armed' with a deadly weapon during the commission of a crime." Gurske, 155 Wash.2d at 138, 118 P.3d 333 (internal quotation marks omitted) (quoting Schelin, 147 Wash.2d at 567, 55 P.3d 632 (plurality opinion)). "[T]he weapon must be easy to get to for use against another person, whether a victim, a drug dealer (for example), or the police." Gurske, 155 Wash.2d at 139, 118 P.3d 333. A defendant does not have to be armed at the moment of arrest to be armed for purposes of the firearm enhancement. State v. O'Neal, 159 Wash.2d 500, 504, 150 P.3d 1121 (2007). "[T]he State need not establish with mathematical precision the specific time and place that a weapon was readily available and easily accessible, so long as it was at the time of the crime." O'Neal, 159 Wash.2d at 504-05, 150 P.3d 1121.
¶ 26 When a crime is a continuing crimelike a drug manufacturing operationa nexus obtains if the weapon is "there to be used," which requires more than just the weapon's presence at the crime scene. State v. Neff, 163 Wash.2d 453, 462, 181 P.3d 819 (2008) (plurality opinion) (quoting Gurske, 155 Wash.2d at 138, 118 P.3d 333). This potential use may be offensive or defensive and may be to facilitate the crime's commission, to escape the scene, or to protect contraband. Neff, 163 Wash.2d at 462, 181 P.3d 819 (plurality opinion) (citing Gurske, 155 Wash.2d at 139, 118 P.3d 333.)
¶ 27 With regard to count I, the unlawful manufacture of marijuana, we note that the State has presented no evidence that the pistol was anywhere but locked in a safe in the bedroom closet at the time that Ruem and/or an accomplice[14] manufactured marijuana. In our view, therefore, the pistol was not "easily accessible and readily available" at the time of this crime because it was not "easy to get to for use against another person." Cf. O'Neal, 159 Wash.2d at 504-05, 150 P.3d 1121 (firearms were "easily accessible and readily available" where police discovered a rifle leaning against a wall and a pistol underneath a mattress in the residence *937 where defendants manufactured drugs);[15]Eckenrode, 159 Wash.2d at 494, 150 P.3d 1116 (firearm was "easily accessible and readily available" where defendant told 911 operator that he had a loaded gun in his hand and was prepared to shoot an intruder); Schelin, 147 Wash.2d at 564, 573-74, 55 P.3d 632 (plurality opinion); Schelin, 147 Wash.2d at 576, 55 P.3d 632 (Alexander, C.J., concurring) (a loaded revolver in a holster hanging from a nail in the wall was "easily accessible and readily available" where the defendant was 6 to 10 feet from the revolver when the police discovered him); State v. Simonson, 91 Wash.App. 874, 876-78, 883, 960 P.2d 955 (1998) (affirming deadly weapon enhancements where police found several guns hidden in a bedroom in a residence where defendant manufactured drugs); but cf. Neff, 163 Wash.2d at 462, 181 P.3d 819 (plurality opinion) (defendant was "armed" where the defendant kept two loaded pistols in a locked safe in the locked garage where he manufactured drugs, together with a loaded pistol in a tool belt hanging from the garage's rafters; the garage also contained counter surveillance equipment). Accordingly, insufficient evidence supported the firearm enhancement on this count.
¶ 28 We conclude, however, that sufficient evidence supported the firearm enhancement on count II, unlawful possession of marijuana with intent to deliver. First, there is a nexus between the weapon and the crime because the safe that contained the pistol also contained harvested marijuana ready for sale and over $2,700 in cash. Second, there is a nexus between Ruem (or an accomplice) and the weapon. Police discovered a large amount of marijuana, cultivation materials, and drug paraphernalia scattered throughout Ruem's home. The bedroom that served as a grow room contained Ruem's identity documents. From these facts, a rational factfinder could have reasonably inferred that Ruem possessed marijuana with intent to deliver and, accordingly, that he knew about the fruits of this crime and the pistol in the safe. Finally, the "easily accessible and readily available" requirement is met for count II because the home's contents and the safe's contents support a reasonable inference that Ruem and/or an accomplice opened the safe to deliver harvested marijuana to buyers and to deposit the sale proceeds. Thus, at the time of delivery, the pistol, which was operable and could have been fired in about one second, was "easily accessible and readily available." As our Supreme Court stated in O'Neal, a valid firearm enhancement does not require the defendant to be armed at the moment of arrest, just "at the time of the crime." 159 Wash.2d at 504-05, 150 P.3d 1121.

III. STATEMENT OF ADDITIONAL GROUNDS (SAG)
¶ 29 In his SAG, Ruem argues that police officers unlawfully seized him and "[went] beyond the reasonable scope of the initial contact" when they ran a warrants check on him while they questioned him. SAG at 1. We disagree.
¶ 30 A seizure occurs under article I, section 7 when "considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he or she is free to leave or decline a request due to an officer's use of force or display of authority." State v. Rankin, 151 Wash.2d 689, 695, 92 P.3d 202 (2004). This is an objective inquiry to determine "whether a reasonable person in the individual's position would feel he or she was being detained." State v. Harrington, 167 Wash.2d 656, 663, 222 P.3d 92 (2009).
¶ 31 The removal of a suspect's identification from the suspect's presence may, in some circumstances, constitute a seizure. See, e.g., State v. Dudas, 52 Wash.App. 832, 833-34, 764 P.2d 1012 (1988) (officer seized individual by taking a suspect's identification back to his or her patrol car to run a warrants check); State v. Aranguren, 42 Wash. *938 App. 452, 457, 711 P.2d 1096 (1985) (same); see also State v. Thomas, 91 Wash.App. 195, 198, 201, 955 P.2d 420 (1998) (officer seized suspect when he stepped back three steps to the rear of the suspect's car while holding suspect's identification in order to use hand-held radio for a warrants check).
¶ 32 Police did not seize Ruem. Nothing in the record indicates that Fries removed Ruem's identification from his presence, as the officers did in Dudas and Aranguren. Nor was Ruem a suspect; Fries asked for Ruem's identification because he physically resembled Chantha, the subject of the arrest warrant. A reasonable person in Ruem's position would recognize from Fries's questioning that Chantha, not Ruem, was the focus of police inquiry. Because a reasonable person would not feel detained under these circumstances, there was no seizure.
¶ 33 We affirm Ruem's convictions, affirm the firearm enhancement on count II, reverse the firearm enhancement on count I, and remand for resentencing.
¶ 34 A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: QUINN-BRINTNALL and JOHANSON, JJ.
NOTES
[1] RAP 10.10.
[2] After the CrR 3.6 hearing, the trial court entered extensive findings of fact and conclusions of law, including 18 "undisputed facts" and 17 "reasons for admissibility or inadmissibility of the evidence." Clerk's Papers (CP) at 204-211.

Ruem stated in his assignments of error that "[t]he trial court erred when it entered Findings and Conclusions 3-17 following a hearing under CrR 3.6." Appellant's Br. at 3. The parties extensively debate the impact of this ambiguous assignment of error. In his reply brief, Ruem clarifies that he meant to challenge the trial court's "reasons for admissibility or inadmissibility of the evidence," which are primarily conclusions of law.
Because Ruem directs his challenge at the trial court's conclusions of law and does not argue that its findings of fact are not supported by substantial evidence, we treat the trial court's 18 undisputed facts as verities. See State v. Afana, 169 Wash.2d 169, 176, 233 P.3d 879 (2010) (unchallenged findings are verities on appeal).
[3] To avoid confusion, we refer to the appellant by his surname and to appellant's family members by their first names. We intend no disrespect.
[4] Fries testified at the suppression hearing that he had received training to recognize marijuana.
[5] Former RCW 69.50.204(c)(14) (1993); RCW 69.50.401(1), (2)(c).
[6] Former RCW 69.50.204(c)(14) (1993); RCW 69.50.401(1), (2)(c).
[7] RCW 9.41.040(1)(a).
[8] RCW 9.94A.533(3).
[9] Ruem did not challenge the validity of his consent in his motion to suppress. Because we resolve this case on the basis of Ruem's consent, we do not address the parties' dispute about whether Chantha's arrest warrant gave police officers a valid justification to enter Ruem's mobile home.
[10] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[11] Because Ruem does not argue that he withdrew consent by stating that it was "not a good time," we do not address this argument. See RP (Dec. 10, 2008) at 33, 49.
[12] Ruem also contends that the trial court should have suppressed evidence of the marijuana plants that police observed next to the mobile home's rear exterior wall. But Ruem's premise for this argument is that the officers were not legally on his property, which we reject in light of Ruem's consent.
[13] At the time of Ruem's crimes, the statute governing deadly weapon special verdicts was codified at RCW 9.94A.602. See LAWS OF 1983, ch. 163, § 3. We cite to the current statute, RCW 9.94A.825, for ease of future reference.
[14] The trial court instructed the jury on accomplice liability. The trial court's instruction on the firearm enhancement also contained accomplice liability language.
[15] In the residence in O'Neal, police also discovered several other guns in two gun safes, one locked and one unlocked. 159 Wash.2d at 503, 150 P.3d 1121. The court, however, did not discuss whether these guns supported the enhancements, because the State's theory focused on the rifle leaning against the wall and the pistol underneath a mattress. See O'Neal, 159 Wash.2d at 504-07, 150 P.3d 1121.